**Roy Robert BRIDGES,**
**Petitioner-Appellant,**

v.

**UNITED STATES of America,**
**Respondent-Appellee.**

No. 85–2569.

United States Court of Appeals,
Seventh Circuit.

Argued April 15, 1986.

Decided June 30, 1986.

Donald V. Morano, Chicago, Ill., for petitioner-appellant.

Debarah Watson, Crim. Div., Dept. of Justice, Washington, D.C., for respondent-appellee.

Before WOOD, and POSNER, Circuit Judges, and FAIRCHILD, Senior Circuit Judge.

HARLINGTON WOOD, Jr., Circuit Judge.

If we accept petitioner Bridges' allegations about his retained trial counsel, J.C.,[1] which we do only for the purposes of this case, his trial counsel would appear to be as guilty as Bridges of wrongful acts interrelated with the cocaine charges to which Bridges pleaded guilty. That involvement created a conflict for his lawyer which Bridges argues robbed him of his Sixth Amendment right to the effective assistance of counsel.

Bridges, in November 1982, entered a plea of guilty to an indictment charging him and two codefendants[2] with distribution of cocaine in 1982, in violation of 21 U.S.C. § 841(a)(1), and with conspiracy to commit that offense in violation of 21 U.S.C. § 846.[3] Bridges' direct appeal to this court, based on a challenge to the constitutionality of the special parole term imposed and on the fact that the district judge had inadequately explained the terms of the special parole provision, was unsuccessful.[4] In July 1985, Bridges filed a motion to vacate his conviction and sentence pursuant to 28 U.S.C. § 2255 on the basis that his trial counsel at his change of plea and sentencing proceedings had been disabled by what we trust is a very rare type of conflict of interest. The motion was denied and this appeal followed.

*Background*

Bridges has had a remarkable record even among seasoned lawbreakers. Some of that history (fifty-nine arrests and fourteen convictions) has a bearing on this case, but it need be recounted only briefly.

The underlying charges to which Bridges pleaded guilty were based on the sale of sixteen ounces of cocaine at a price of $27,500. The transaction involved Bridges, and codefendants Bounos and Barnes, in a cocaine sale to Sergeant P.C., *see* footnote 1, an undercover police officer assigned to the DEA Task Force in Chicago. The arrests were made immediately upon the closing of the transaction.

Bridges pleaded not guilty, but later, in November 1982, appeared with his trial counsel, J.C., and sought to withdraw his plea of not guilty and enter a plea of guilty. The district judge thoroughly probed the usual circumstances before accepting the guilty plea as being both knowingly and voluntarily made. At the time, Bridges was thirty-five years of age with a high school education. He advised the court under oath that he had discussed the case and his possible defenses with his attorney on several occasions. Bridges assured the court that he was satisfied with his attorney. After the court explained the charges, the possible sentences, and the rights Bridges would be waiving by his guilty plea, Bridges responded that he understood it all. The court then explored the possibility of whether any threats or promises might have induced the change of plea, or whether there might be some understanding or agreement as to the sen-

1. As the record does not disclose the truth or falsity of Bridges' allegations about the criminal conduct of his trial counsel, we refer to his trial counsel only by the initials "J.C." Similarly, the police sergeant who also was allegedly involved in criminal activities is referred to by the initials "P.C."

2. Codefendants Jimmy T. Barnes and Michael Bounos both pleaded guilty to the conspiracy count. Barnes also entered a plea of guilty to two substantive drug counts.

3. Bridges was sentenced to twelve years imprisonment, later reduced to nine, and a lifetime special parole term on the distribution count. On the conspiracy count sentence was suspended and Bridges was placed on five years probation to run concurrently with his sentence on the distribution count. The sentencing judge recommended incarceration in a correctional facility with an intensive drug abuse program. Probation was conditioned on payment of a $1,000 fine and participation in a drug abuse offender program.

4. *United States v. Bridges,* 760 F.2d 151 (7th Cir.1985).

tence to be imposed. Bridges denied those possibilities. The government then summarized the evidence. Bridges conceded the government's evidentiary recital was accurate, and admitted that he had in fact committed the crimes charged.

Subsequently, at the sentencing proceedings in December 1982, his attorney J.C. urged the court to take into consideration various mitigating factors including Bridges' drug problems and his earnest desire to undergo a drug rehabilitation program, his clean record for the past six years, his minimal intermediary role in the current cocaine charges, his forthright admissions of guilt, his relative youth, and his potential for return to society as a useful member. Bridges, for himself, expressed remorse for his wrongdoing, blaming it on his personal drug problem. The government in response branded Bridges a career criminal without hope of rehabilitation. Sentence was then imposed, the judge commenting that defense counsel had "well stated" the position of his client.

The government's interest in Bridges, however, continued. In April 1985, the government by information charged Bridges with conspiring from 1979 to 1982 to violate federal narcotics laws and with using the telephone for that purpose. A charge of failure to file an income tax return for 1979 was also included. A plea agreement was reached with Bridges which provided, among other things, that Bridges cooperate with the government. Two weeks after sentence was imposed in accordance with the plea agreement Bridges filed a motion pursuant to 28 U.S.C. § 2255 seeking to vacate his 1982 conviction and sentence on the basis that he had been denied the effective assistance of counsel because his attorney at the time, J.C., was laboring under a conflict of interest.

Bridges, in support of his section 2255 motion, alleged the following unsubstantiated story about J.C. and others which must be briefly recounted here. In 1979 Bridges was arrested on charges of murdering a drug dealer and retained J.C. to represent him. Bridges began serving as a bodyguard for a Sam Sarcinelli, identified by Bridges as a drug dealer. Bridges advised J.C. of his new employment and the availability his employment provided for receiving cocaine through Sarcinelli. Bridges claims that thereafter he supplied J.C. with cocaine for personal use. In return J.C. referred a cocaine customer, Irving Napue, to Bridges. Bridges later was advised by J.C. that it would take $50,000 "to take care of" his murder charge, one-half of which was to go to the judge. Bridges raised the money by additional drug transactions with his employer and his new customer. Bridges was eventually acquitted of the murder charge at a bench trial.

The defense fund drug transactions gave rise to some state drug charges which were usually based on arrests by Sergeant P.C. J.C. assured Bridges that he would not go to jail because Sergeant P.C. was "under control," and that Sergeant P.C.'s warrants would always have a saving deficiency. But, says Bridges, J.C. colluded with Sergeant P.C. to "set him up," by arranging for his arrest when it was known where he would be when in possession of drugs. J.C. would then exact a substantial fee for Bridges' defense. By 1980 Bridges claims he had discovered the setup and had discontinued letting J.C. know where he was. Nevertheless, Bridges continued to retain J.C. as his attorney in a series of theft and drug charges likely resulting from Sergeant P.C.'s continuing arrests of Bridges.

Sergeant P.C., in respect to one charge against Bridges, offered to "take care of" the case himself for drugs or money, and offered to alert Bridges in advance about new indictments for $25,000. That relationship, according to Bridges, continued to develop. Sergeant P.C. suggested that he and Bridges work together on drug deals, this time by setting others up. Bridges was to arrange the sales and Sergeant P.C. was to make the arrests, seize the drugs, and then Bridges and Sergeant P.C. would split the profits. Sergeant P.C. had assured Bridges that if arrested he would vouch for Bridges as legitimately working

with him on drug cases. That partnership did not function as well as Bridges anticipated, particularly when he was arrested on the federal charges underlying this case. J.C., according to Bridges, advised him that the government case was weak and, that he, J.C., would "go against" Sergeant P.C. On the other hand, J.C. advised Bridges that if he pleaded guilty he would be sentenced to no more than five years imprisonment with five years probation.

Based on his version of the background history, Bridges now argues that he was deprived of the effective assistance of counsel. Bridges contends that a conflict existed which disabled his defense since it was in J.C.'s own best interest for Bridges to enter a guilty plea and bring the case to a close before J.C. would run the danger of exposing his own activities in a trial or plea bargain. According to Bridges, J.C. therefore induced him with false assurances to plead guilty.

### Bridges' Section 2255 Motion

Hearing the motion on the pleadings, exhibits and arguments of counsel, the district court denied Bridges' motion brought pursuant to section 2255. The court noted that Bridges, who was no longer being represented by J.C., had not explained his failure to raise the ineffective assistance of counsel issue during his change of plea proceedings or on direct appeal. Instead, he had assured the court under oath at the change of plea hearing that he was satisfied with J.C.'s representation, and that there were no understandings or agreements about the sentence that might be imposed. The court went on to find that Bridges had not established any prejudice from the claimed conflict considering the overwhelming evidence of guilt against him and the denial by the government that it had ever contemplated entering into a plea agreement with Bridges. The court further noted Bridges' extensive criminal curricula vitae, and the lack of merit in any possible entrapment defense, the defense suggested by Bridges. The district judge also condemned Bridges' efforts to hold this insufficiency of counsel issue quietly in reserve for use until the time arose, if ever, in which he needed it.

### Analysis

There is no dispute but that the Sixth Amendment guarantees a criminal defendant the right to the effective assistance of counsel, *Strickland v. Washington,* 466 U.S. 668, 684–86, 104 S.Ct. 2052, 2062–64, 80 L.Ed.2d 674 (1984); *United States v. Cronic,* 466 U.S. 648, 653–57, 104 S.Ct. 2039, 2043–46, 80 L.Ed.2d 657 (1984); *Cuyler v. Sullivan,* 446 U.S. 335, 344, 100 S.Ct. 1708, 1716, 64 L.Ed.2d 333 (1980), which includes a right to counsel who is free of any actual conflict of interest. *Strickland,* 466 U.S. at 686, 688, 104 S.Ct. at 2064, 2065; *Glasser v. United States,* 315 U.S. 60, 70, 62 S.Ct. 457, 464, 86 L.Ed. 680 (1942). Moreover, it is equally clear that the right to conflict-free counsel encompasses all stages of the criminal proceeding. *Holloway v. Arkansas,* 435 U.S. 475, 489, 98 S.Ct. 1173, 1181, 55 L.Ed.2d 426 (1978); *United States v. Mavrick,* 601 F.2d 921, 931 (7th Cir.1979). Bridges argues that J.C.'s alleged entanglements with him in criminal activities constituted an actual conflict of interest, not just a potential conflict, which adversely affected his counsel's performance, and, therefore, as a matter of law, violated his Sixth Amendment right.

It is the government's position that Bridges knowingly, voluntarily and intelligently waived his right to be represented by conflict-free counsel in the same way as a defendant may waive any constitutional right. To support its position, the government relies on *Holloway,* 435 U.S. at 483 n. 5, 98 S.Ct. at 1178 n. 5 (citing *Glasser,* 315 U.S. at 70, 62 S.Ct. at 464); *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938); *United States v. Noble,* 754 F.2d 1324, 1333 (7th Cir.), *cert. denied,* — U.S. —, 106 S.Ct. 63, 88 L.Ed.2d 51 (1985); and *United States v. Bradshaw,* 719 F.2d 907, 911 (7th Cir. 1983). The cases the government cites, however, with the exception of *Johnson v. Zerbst* in which the defendants had no

counsel, are all cases of multiple defendants being represented by the same counsel. The issue in several of those cases was whether or not the trial judge sufficiently inquired into the possible conflict issue to insure that the defendant's waiver was voluntarily, knowingly, and intelligently made with sufficient awareness of the relevant circumstances and likely consequences. *See Brady v. United States*, 397 U.S. 742, 748, 90 S.Ct. 1463, 1468, 25 L.Ed.2d 747 (1970).[5]

Neither Bridges nor his counsel, however, suggested any possible conflict problem to the trial judge, although Bridges had the opportunity to do so. To the contrary, Bridges assured the court that he was satisfied with his counsel. There was nothing in the circumstances to give the court the slightest indication that J.C. himself might be criminally involved. Moreover, owing in part to the fact that J.C. represented none of Bridges' codefendants, there was nothing else that might have suggested to the court the existence of a potential conflict. The trial court had, in other words, absolutely no opportunity to avoid this secret conflict known only to Bridges and J.C.

Nor can Bridges find help in the multiple representation cases. Bridges argues that he, "still retained the right to effective assistance of counsel, unless he waived it on the record." Indeed, he maintains that an "implicit waiver" is invalid and contends, relying on *Von Moltke v. Gillies*, 332 U.S. 708, 723–724, 68 S.Ct. 316, 323–24, 92 L.Ed. 309 (1948), that "there must be an affirmative judicial involvement in the waiver process." *Von Moltke*, however, found fault with the trial judge's momentary appointment of reluctant counsel just for the two or three minutes it took for an otherwise lawyerless defendant to enter a plea of not guilty. The trial judge said he would appoint another lawyer soon, but did not. In the meantime, another trial judge accepted the defendant's change of plea after signing a written waiver of counsel, briefly accomplished without counsel during an interlude in another trial. The circumstances of the present case are easily distinguished from *Von Moltke* and similar cases.

Our decision in *United States v. Marrera*, 768 F.2d 201 (7th Cir.1985), is also of little help to Bridges. In *Marrera* we found the defendant shared the blame with his lawyer with respect to the existence of a conflict. In the present case the blame is totally on Bridges, who fully knew and understood what the conflict was. Bridges argues there was nothing he could have done sooner or otherwise with respect to J.C. that would not have exposed him (Bridges) to other criminal charges. He had to wait, he says, until he received immunity from the government for the earlier criminal acts. The answer to Bridges' alleged dilemma is simple. He had hired J.C. and he could have fired him, and then hired another lawyer without opening any box of new problems for himself.

As distinguishable as the attorney conflict cases may be on their facts, the cases do recognize that the right to the assistance of counsel may be waived. That waiver, to be effective, must, of course, be voluntarily, knowingly, and intelligently done with sufficient awareness of the relevant circumstances and likely consequences. In the usual case that can be determined from the record after an examination of how the matter was explored by the trial judge. That does not mean, however, that waiver can never be determined without the usual searching inquiry of the district judge on the record.

Bridges, thirty-five years of age, had a high school education supplemented by considerable practical experience as a criminal who was regularly in and out of court. He retained J.C. in 1979, and thereafter used him constantly to handle his string of criminal charges. Bridges knew firsthand about J.C.'s alleged drug and other criminal activity as Bridges was personally in-

---

**5.** Fed.R.Crim.P. 44(c) seeks to provide that waivers are knowingly and intelligently made, a rule commonly applied to all waivers, but Rule 44(c) by its own terms applies only to cases of multiple representation.

volved with him. By 1980 Bridges also knew that J.C. was setting him up and benefiting from it, but for the next two years he continued with J.C. as his lawyer. Either because of intentionally faulty warrants or corruptible officials Bridges was usually able to remain outside of jail. What really underlies Bridges' complaint is that because of J.C.'s inability to fix this federal case, as he says J.C. had done for him in the past with state cases, he has been denied his constitutional right to the effective assistance of counsel. Apparently we are not reading the same Constitution. Considering the evidence against Bridges, the lack of any viable defense, and Bridges' record, it cannot be said that under the circumstances J.C. did not do as well for Bridges as most any other lawyer could have done.

Bridges' appellate counsel, not J.C., in his brief presents us with several pages of what he describes as a "phenomenological study" in which he seeks to illustrate the conflict issue by a fictionalized conversation that J.C. might have had with himself. If, however, the learned district judge, who could have had not the slightest inkling of this conflict, had had the benefit of some wisdom beyond that of ordinary mortals, which we judges sometimes think we possess, the district judge could have advised Bridges that he ought to retain another attorney. Our own "phenomenological study," however, suggests that Bridges might well have responded that the judge was violating his constitutional rights to have retained counsel of his own choice, and that J.C., who had served him well through many other escapades, was his one and only choice. *See United States ex rel. Tonaldi v. Elrod,* 716 F.2d 431, 439 (7th Cir.1983). So be it.

■ Bridges, as was laid out in detail in his own pleadings, had all the information long before entering his guilty plea. Bridges chose to trust J.C. with his defense in spite of J.C.'s known untrustworthiness. The waiver of constitutional rights, in general, may be effective even without specific knowledge of all the implications. *Id.* at 438. Bridges, however, was experienced enough in criminal proceedings to have an understanding of even the implications. The particular words that ordinarily surround waiver in open court are not in the record here, but circumstantially and directly the necessary elements of a valid waiver are present in the record in Bridges' own words. The law is not so blind, foolish or naive to permit this attack by Bridges on his guilty plea in the facade of a constitutional right. He knew what he was doing, voluntarily made his own choice, and misled the trial court in the process.

We do not intend in these particular circumstances to condone this effort by Bridges to benefit from his own informed choice of an attorney. It smacks of bad faith and of a deliberate design to lay a groundwork for this appeal when all else had failed. We are not the first court to consider this possibility. "[A]n accused may still waive his right to independent counsel by knowingly and intelligently proceeding with the challenged counsel or by *intentionally, and in bad faith, pursuing a course of action deliberately designed to lay a groundwork for reversal.*" *United States v. Alvarez,* 580 F.2d 1251, 1260 (5th Cir.1978) (emphasis added).

The district judge in ruling on this conflict issue noted that Bridges was raising the issue for the first time. The district court denied the motion on the basis that Bridges had shown neither cause nor prejudice to explain his failure to raise it previously. However, the district court also considered that Bridges had been under oath at the change of plea hearing, the time when he stated he was satisfied with J.C. It also appeared, the district court noted, that the evidence against Bridges was "overwhelming." The district court also recognized that Bridges was concededly a career criminal. The district judge then approached the issue upon which this appeal turns.

The court noted that Bridges, who was being represented by his present appellate counsel and not by J.C., had directly appealed the sentence imposed after his plea

of guilty, but not including, however, the conflict of interest issue. For his own purposes he had kept that issue a secret throughout the whole trial court process. The district judge found that Bridges could not now be permitted "to try to take advantage of the criminal justice system by sort of salting away and saving, through what alone he knows, something he thinks will vacate and render null and void a long, tortuous criminal justice procedure that is undertaken in good faith by other parties." The district judge went on to hold that Bridges should have raised the issue as soon as he knew about it, and not to "secretly, in his own mind, preserve some possible claim of untoward activity that he thinks may then vitiate the whole previous proceeding when all else fails." We agree with the district judge's findings and with his realistic and practical resolution of this issue.

It does no violence to the important constitutional right to counsel to bring this matter to an end by affirming the denial of Bridges' motion to vacate his sentence and conviction. Both his conviction and his sentence were well earned by Bridges, and they pass constitutional muster.

AFFIRMED.