UNITED STATES of America, Plaintiff-Appellee,

v.

Loren LEVINE, Defendant-Appellant.

No. 84–1407.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 28, 1986.

Decided June 30, 1986.

Alan M. Freedman, Chicago, Ill., for defendant-appellant.

Pierre Talbert, Asst. U.S. Atty., Anton Valukas, U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Before WOOD, and EASTERBROOK, Circuit Judges, and BARKER, District Judge.*

HARLINGTON WOOD, Jr., Circuit Judge.

In May 1983 defendant Loren Levine, a jewelry sales representative, was charged with thirteen counts of mail fraud in violation of 18 U.S.C. § 1341, and two counts of wire fraud in violation of 18 U.S.C. § 1343.[1] The principal issue in this appeal is Levine's complaint that he had inadequate assistance of counsel arising from his attorney's conflict of interest. That issue arose during the investigation prior to indictment when Levine, in a taped conversation with an informant, made statements implicating his attorney, William Murphy, in the matters with which Levine was later charged.

### Factual Background

From March 1979 to August 1979 Levine[2] was employed by Lido Imports, Ltd., as a jewelry sales representative. Lido was in the jewelry importing and wholesaling business. Levine satisfied Lido that he should be permitted to handle his sales differently than Lido's other salesmen. In contrast to other salesmen, Levine was given the Lido jewelry for direct delivery to his customers, instead of the jewelry being sent by mail directly from Lido. Levine's customers in turn paid Levine instead of mailing payments on their accounts directly to Lido. What payments Lido did receive for its jewelry came from Levine, not the customers. Lido also did not send monthly statements to Levine's customers.

Merely to state that working relationship predicts Levine's fraud on Lido. During his association Levine obtained about $1.4 million in jewelry from Lido based on completed order forms purporting to represent sales to about seventy-six retail jewelers. Levine paid Lido about $500,000 from time to time on a few genuine sales and on the fictitious sales. Instead of kiting checks Levine was kiting sales. Only about fifteen of Levine's claimed customers were legitimate. Levine looked like a star salesman, but in fact was a star schemer.

In a recorded conversation with an informant, Levine explained how unusually profitable his particular type of salesmanship had been. When the scheme was uncovered state charges were brought against him, Levine related, but were dismissed at the preliminary hearing. In this taped conversation, Levine explained the arrangements he had with attorney Murphy for his defense. The substance of it was that Murphy allegedly fixed the state's case against him. In return for that successful outcome, Levine did not pay Murphy any substantial cash amounts, but instead paid in jewelry, "$10,000 in diamonds all the time." Cash payments to Murphy were also unnecessary because, in Levine's own words, "if he got me off ... he was my partner in the gold deal." Levine concluded by saying that Murphy had told him not to do anything for awhile about his out-of-town safety deposit boxes full of the fruits of his fraudulent scheme.

### Attorney Conflict of Interest

Levine casts the issue on appeal in two forms, conflict of interest, and integrity of the judicial system.

Following his entry of a not guilty plea in May 1983, Levine moved in July 1983 to substitute William P. Murphy and Thomas Peters, Murphy's partner, as his attorneys in place of the Public Defender. The

---

* The Honorable Sarah Evans Barker, District Judge for the Southern District of Indiana, is sitting by designation.

1. Prior to trial the government dismissed nine of the counts. Levine was found guilty of the remaining counts in a jury trial and was sentenced to two consecutive terms of four years imprisonment, and five years consecutive probation provided that he make restitution of $720,000, participate in Gamblers Anonymous and Alcoholics Anonymous, undergo periodic drug testing, and obtain psychiatric or psychological counselling.

2. Levine was doing business as Bentley, Inc.

government, relying on Levine's taped comments implicating Murphy in illegal activities, opposed the substitution on the ground that Levine was creating a conflict of interest with Murphy as his trial attorney. Levine's response to the government's objection was a motion to suppress the tape on the basis that his recorded references to "Murphy" as his attorney in the state case would prejudice his defense in the federal case. By agreement, the name "Murphy" was deleted from the tape and the suppression denied. The conflict of interest issue was then directly raised and Murphy assured the court that he had gone over the matter repeatedly with Levine and that Levine fully understood that to go ahead would constitute a waiver. Judge Shadur was not satisfied, and, foreseeing exactly what has now developed, advised the parties that he was going to explore the situation on the record.

In August 1983, Levine followed up by filing an affidavit expressing his desire to be represented by Murphy. By this time, the defense had been supplied with a copy of the taped conversation. In the affidavit Levine admits his awareness of his taped comments and concedes that the "Murphy" mentioned in the tape is his present trial attorney. He further states that he had gone over the situation with his attorneys, and was aware that if he so desired the court would appoint a qualified attorney to replace Murphy. Nevertheless, in the affidavit, Levine insists on retaining Murphy and waives the right to raise the issue on appeal, or in any collateral proceeding, and further waives any defense or objection which might arise from the conflict stemming from Murphy's alleged involvement in the indictment's allegations. The government responded with a request that Levine be placed under oath and the matter further explored on the record.

Judge Shadur, without objection from Levine or his attorneys, proceeded to place Levine under oath. As a prologue, Judge Shadur advised Levine that he was going to assume just for purposes of the hearing that Murphy may have engaged in unlawful conduct in connection with the charges against Levine. The judge then explained to Levine the possibility that Levine could use for his own benefit any information that he might have about the unlawful conduct of others which might be of interest and use to the government. It was suggested that cooperation with the government might reduce the pending counts, influence a sentencing recommendation if he were to be convicted, or be used to negotiate a plea. Levine said he understood the possibilities. Judge Shadur then queried Levine if he understood that he could not later claim that the conflict of interest prejudiced his defense because, as the judge put it, "Mr. Murphy's interest would be inconsistent with your own [due to] his own instincts for self-preservation." It was also explained to Levine that he could not later complain that because of the conflict he had not had "the undivided loyalty that is required of every lawyer representing every client." It was further explained that a lawyer's judgment in the present circumstances might be colored by a desire not to have his own conduct exposed. It was also explained that it could influence trial decisions, for example, whether to testify, and what other witnesses to call. Levine was further warned that he could not later argue that he had been deceived or misled by his attorneys, or others, on the basis that no person can serve two masters. Levine was cautioned that he could not call Murphy as a witness if he retained him as trial counsel. The trial judge advised that there were a "great many dangers and problems inherent" in the situation, and that what he had covered was not necessarily exhaustive.

Following a government suggestion, the court also inquired if Levine might desire to consult independently with some other lawyer or the public defender. Levine's response was that he had already talked to his family, to both of his attorneys, and also to other attorneys. He concluded by saying: "I still would like to go ahead with Mr. Murphy and Mr. Peters. I have a lot of confidence in them, and [Mr. Murphy] is a lifelong friend of mine." After this in-

quiry, the court accepted Levine's written waiver. Levine at the time was thirty-nine years of age with at least some college education and with many years of business experience.

■ Judge Shadur stated that he had done all that was possible under the circumstances, and we agree. The record is abundantly clear that Levine effected the waiver knowingly, voluntarily, and intelligently, in light of his background, experience, and conduct. *See United States v. Noble,* 754 F.2d 1324, 1333 (7th Cir.), *cert. denied,* —— U.S. ——, 106 S.Ct. 63, 88 L.Ed.2d 51 (1985). There is no doubt that a defendant may waive his right to effective assistance of counsel. *Holloway v. Arkansas,* 435 U.S. 475, 483 n. 5, 98 S.Ct. 1173, 1178 n. 5, 55 L.Ed.2d 426 (1978). In *Zuck v. Alabama,* 588 F.2d 436, *cert. denied,* 444 U.S. 833, 100 S.Ct. 63, 62 L.Ed.2d 42 (1979), the Fifth Circuit explained that the defendant must be aware of the conflict, realize the consequences to his defense that continuing with counsel under the onus of a conflict could have, and also be aware that he has the right to obtain other counsel. *Id.* at 440. The judge has a part to play and must ascertain that the defendant comprehends the situation. *United States v. Garcia,* 517 F.2d 272, 278 (5th Cir.1975). Nonetheless, it remains clear that, since a defendant may waive his right to be represented by counsel altogether, there is no basis to say that a defendant cannot waive the right to counsel free from even serious conflicts of interest. *Id.* at 277. We have recently reached similar conclusions in considering other conflict of interest problems. *E.g., Bridges v. United States,* 794 F.2d 1189, 1194 (7th Cir.1986); *Noble,* 754 F.2d at 1333–35; *United States v. Bradshaw,* 719 F.2d 907, 911–13 (7th Cir.1983).

Levine fully knew firsthand about the alleged involvement of Murphy. He deliberately created the conflict of interest by discharging the public defender and retaining Murphy for this federal case. He showed awareness of the potential for conflict by seeking to suppress the tape because the reference to Murphy might prejudice his defense. He filed an affidavit seeking to keep Murphy, and later persisted under oath to claim he knew what he was doing and that he wanted Murphy and no one else. He got what he wanted. We will not now hear his complaint regarding an issue he agreed not to raise. When it was over Judge Shadur said that Levine's attorneys had done a very creditable job. Levine was given the right to have counsel of his choice and his choice was clear. With guilt so obvious, it cannot be seen, in any event, how any other lawyer could have done any more for him. His waiver is constitutionally acceptable.

It is interesting to note that Levine, citing *United States v. Snyder,* 707 F.2d 139 (5th Cir.1983), and *United States v. Hobson,* 672 F.2d 825 (11th Cir.) (per curiam), *cert. denied,* 459 U.S. 906, 103 S.Ct. 208, 74 L.Ed.2d 166 (1982), also shows great concern about his attorney conflict situation adversely affecting the court's and the public's interest in preserving the integrity of the court system and the fair administration of justice. We appreciate Levine's belated concern about the integrity of the court system, one of its most important attributes, but we do not see the system as now requiring Levine's assistance nor being adversely affected by his conviction. The jury was completely shielded from any knowledge of the conflict. No mention was made before the jury of Murphy in any other context except as Levine's present trial attorney.

Contrary to Levine's contention, the decision in *Snyder* is not on point. In *Snyder* the situation was most unusual since the defendant retained as his attorney an indicted coconspirator whom the court promptly disqualified. The defendant then claimed he had been deprived of his Sixth Amendment right to counsel of his choice. 707 F.2d at 143. A thoughtful defendant can easily see in the attorney conflict situation the potential that he may be able to have it both ways. If the attorney is disqualified, he makes the deprivation argument made in *Snyder;* however, if counsel

is not disqualified, he is then free to make the argument advanced by Levine. More likely than not a defendant who fulfills the waiver requirements as in the present case, or whose waiver plea is rejected, or a defendant who seeks to keep the issue secretly in reserve as in *Bridges, supra*, will end up having both options foreclosed.

Levine's reliance on *Hobson* is similarly misplaced. In *Hobson* the government advised the court that two of its witnesses would testify that they were present in defendant's counsel's office when there was a discussion of making arrangements to unload marijuana from an airplane. Hobson was indicted for drug trafficking. The trial judge's disqualification of the attorney was upheld because it was viewed as likely resulting in the erosion of public confidence in the integrity of the bar and the legal system. 672 F.2d at 828–29. There was concern that when the government witnesses in their testimony directly implicated Hobson's trial lawyer, the system would suffer. In dissent, it was argued, however, that Hobson should have been permitted to retain his chosen counsel in accordance with the Sixth Amendment. 672 F.2d at 830–31. In Levine's case, however, the jury was protected from the conflict because his trial attorney was not identified as the same attorney who represented Levine in the state case. Murphy's name had been excised from the tape before it was heard by the jury. The jury could only speculate, but that possible speculation is not enough to jeopardize our judicial system.

■ Judgments may differ in a situation like this, but we find little reason not to support Judge Shadur's thorough pretrial examination of the problem and the exercise of his sound discretion in permitting Levine to have the only counsel he wanted.

Reversal and a new trial are not warranted in this case.[3]

Affirmed.

---

**3.** Levine also claims the mail fraud counts are multiplicitous, although he failed to make this challenge at trial. *See United States v. Covelli,* 738 F.2d 847, 862 (7th Cir.), *cert. denied,* — U.S. ——, 105 S.Ct. 211, 83 L.Ed.2d 141 (1984). Even overlooking that failure, however, his claim lacks merit. Payment was often made by Lido by mail to the jewelry suppliers for the jewelry which Levine gained by fraud. Each mailing was a separate offense caused by Levine. Moreover, Levine knew that the use of the mails would follow in the ordinary course of Lido's business and his fraudulent activities. *See Pereira v. United States,* 347 U.S. 1, 8–9, 74 S.Ct. 358, 362–63, 98 L.Ed. 435 (1954). Levine's multiplicity claim is, therefore, unfounded.