# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**
August 17, 2018

Lyle W. Cayce
Clerk

No. 17-50487

SEALED APPELLEE,

> Plaintiff - Appellee

v.

SEALED APPELLANT,

> Defendant - Appellant

Appeal from the United States District Court
for the Western District of Texas

Before CLEMENT, HIGGINSON, and HO, Circuit Judges.

STEPHEN A. HIGGINSON, Circuit Judge:

Angus McGinty, a former Texas state court judge, pleaded guilty to Honest Services Wire Fraud after accepting bribes for favorable rulings. McGinty now alleges that his attorneys were suspects in the same corruption investigation that led to his conviction. He argues that his attorneys' potential criminal liability created a conflict that infringed his Sixth Amendment right to effective counsel, and seeks to vacate his conviction pursuant to 28 U.S.C. § 2255.

The district court denied McGinty's motion to vacate, holding that McGinty failed to show that his counsel's performance was deficient or that any deficiency prejudiced his defense. We affirm on the alternative basis that

McGinty knowingly, intelligently, and voluntarily waived the purported conflict.

I.

Angus McGinty served as an elected judge of the 144th Judicial District Court in Bexar County, Texas, from January 2011 until his resignation on February 14, 2014. On April 13, 2015, McGinty pleaded guilty to one count of Honest Services Wire Fraud. Consistent with a plea agreement entered under Federal Rule of Criminal Procedure 11(c)(1)(C), the court imposed a 24 month sentence.

A.

The investigation that culminated in Angus McGinty's conviction began with a tip. In early March 2013, an informant told an FBI agent that Albert Acevedo, Jr., a local criminal defense attorney, was paying for repairs to McGinty's car in exchange for favorable rulings. Consensual recordings and a wiretap confirmed the informant's story.

In conversations recorded over the next several months, Acevedo discussed paying to repair and sell McGinty's car. When the car sold (to an FBI agent) for $700 less than McGinty was asking, recorded conversations indicate that Acevedo made up the difference out of his own pocket. When Acevedo texted McGinty to say he had the cash from the car sale, McGinty responded: "Well I'm a whore for money." After selling McGinty's old car, Acevedo also paid to find, repair, and register a new car for McGinty.

In total, Acevedo provided McGinty with approximately $6,655 in car-related services. This generosity did not go unrewarded. Acevedo told the informant that McGinty did "a lot of shit for [him]." Acevedo raved that McGinty sold influence at a relative steal; unlike a former judge that used to ask for "a grand every couple days," McGinty "doesn't ask for much. I'll give

2

him cash and he won't say nothing." In August 2013, Acevedo called McGinty and requested that one of his clients be removed from electronic monitoring. Without asking the client's name or what he was charged with, McGinty agreed. Intercepted communications also show that McGinty agreed to remove an alcohol monitoring release requirement for one defendant and to recall an arrest warrant for another at Acevedo's request.

In December 2013, FBI agents confronted Acevedo with the results of their investigation and Acevedo agreed to cooperate. According to one of the FBI agents that interviewed him, Acevedo "made a myriad of allegations against other individuals." Acevedo "stated that he was not the only attorney with influence in McGinty's court" and gave Alan Brown and Jay Norton, two partners at a local criminal defense firm, "as examples of other attorneys who got favorable rulings from McGinty."[1] When pressed, however, Acevedo said that his allegations against Brown and Norton were based only on his "observations around the courthouse" and he "admitted that he did not have concrete information that Brown or Norton were involved in public corruption."

The agents returned to interview Acevedo the next day, and Brown and Norton's names came up again. According to the agent's account, Acevedo said that he gave judges campaign contributions, and then "stated that Brown and Norton also made campaign contributions to judges and had more influence with judges than he did." Ten days later, in another interview, Acevedo relayed to the agents a secondhand account "that Brown had said that he had heard

---

[1] We emphasize that Acevedo and McGinty's allegations against Alan Brown and Jay Norton are nothing more than allegations. As noted below, the FBI investigated McGinty's allegations and could not substantiate them.

from a local judge that Acevedo was 'debriefing with the Fed's on public corruption cases' and wanted to know if the rumor was true."[2]

By January 2014, according to FBI agents, the corruption investigation had "become a topic of interest among attorneys" in the San Antonio area. That month, McGinty hand-delivered a backdated check to the mechanic that had repaired his car at Acevedo's request. FBI agents watched and recorded the meeting.

FBI agents confronted McGinty about two weeks later. According to the agents, McGinty initially lied about where he got the parts to repair his car. After being presented with the evidence against him, McGinty stated that "[t]his looks really bad" and that it appeared he had been "bought." McGinty told the agents that he wanted to speak with a lawyer, Alan Brown.

B.

In June of 2014, McGinty was indicted in the Western District of Texas for Federal Programs Bribery, Conspiracy to Commit Federal Programs Bribery, Extortion under Color of Official Right, and twelve counts of Honest Services Wire Fraud. McGinty retained Brown and Norton—the same two lawyers Acevedo had identified to the FBI—to represent him. McGinty also retained a third lawyer to serve as co-counsel to Brown and Norton, as to whom he has made no argument of a conflict of interest.

While McGinty's case was pending before the district court, the government filed a Notice of Potential Conflict of Interest. The notice explained that Brown also represented another defendant, Cruz Dosdado Aranda, whom Acevedo had previously represented in state court.

---

[2]    According to the government, Acevedo eventually pleaded guilty to one count of Federal Programs Bribery and adopted "an extensive factual basis detailing his corrupt dealings with McGinty."

The district court addressed the potential conflict at a status hearing. The district judge personally addressed McGinty and told him that the government had raised a potential conflict. The judge explained that a conflict could undermine McGinty's representation and that McGinty had a right to conflict-free counsel. McGinty said that he understood and wanted to proceed with Brown and Norton.

Two weeks later, McGinty signed a plea agreement pursuant to Rule 11(c)(1)(C). In the agreement, McGinty stated that he was "fully satisfied with [his] attorney's legal representation." He reiterated his satisfaction with his multiple counsel at his plea hearing. On July 15, 2015, the district court sentenced McGinty to 24 months' imprisonment, consistent with the term agreed to by McGinty in his plea agreement, which also led to the dismissal of all but the one count. The court also imposed a one year term of supervised release and a special assessment of $100. McGinty did not file an appeal.

C.

In December 2015, McGinty requested an interview with FBI agents. According to one of the agents, McGinty stated at this meeting that he had received favors from several lawyers while serving as judge. He singled out Brown and Norton, and stated that the two attorneys had given him cash and free legal representation. McGinty specifically alleged that Brown gave him an envelope of cash after McGinty set bond for one of Brown's clients. He also stated that Brown came to his chambers to talk about a client, and that before discussing the case, Brown asked how Norton's (free) representation of McGinty was going. McGinty said that he sentenced Brown's client to probation rather than prison based on the favors he received from Brown and Norton. McGinty stated that he had initially wanted to cooperate with the government, but that Brown and Norton convinced him not to. McGinty

speculated that Brown and Norton advised him to plead guilty to protect themselves.

The FBI was unable to substantiate McGinty's allegations against his attorneys. A search of McGinty's text messages turned up nothing incriminating. Investigation revealed that the defendant that McGinty claimed received probation due to Brown and Norton's influence actually got his break based on a favorable plea deal negotiated with the prosecutor. In the end, the United States declined to prosecute Brown and Norton.

## D.

McGinty filed his first, pro se motion to vacate his sentence pursuant to 28 U.S.C. § 2255 on July 14, 2016. In his motion, McGinty stated that he first became aware that he was the target of an FBI investigation when Norton called to arrange an urgent meeting in a restaurant parking lot. Norton told McGinty that a prosecutor had informed Norton and his partner Brown of the investigation. Norton and Brown agreed that Brown would speak with two other judges, and Norton would speak with McGinty. Norton told McGinty that if the FBI contacted him, he should not answer any questions.

According to McGinty, after he did talk to the FBI in January 2014, Brown and Norton were "very upset." Brown told McGinty that Brown "had already told others in the legal community that [McGinty] had spoken with the government." The lawyers said they were going to help McGinty, but told him "not to worry" about paying. McGinty also alleged that Brown and Norton told him they were discussing his case with other judges and members of the San Antonio legal community. Brown told McGinty that Aranda—Brown's other client that the government raised as a potential conflict—told the FBI that Acevedo had bribed another district judge. Brown said he had already warned that judge.

6

McGinty further alleged in this first, pro se habeas motion that Brown and Norton's self-interest led them to forcefully discourage him from cooperating with the government. McGinty alleged that Brown and Norton told him that if he cooperated he would be labeled a snitch, his life would be in danger, and Brown and Norton would refuse to further represent him. Consequently, McGinty sought to vacate his guilty plea on the grounds that his defense counsel had discouraged him from cooperation that would have been beneficial to him.

## E.

The district court appointed an attorney to represent McGinty in his § 2255 proceeding.[3] McGinty's attorney filed an amended motion, arguing that Brown and Norton were suspects in the FBI's corruption investigation and that this conflict violated McGinty's Sixth Amendment right to counsel. Relying on *Cuyler v. Sullivan*, 446 U.S. 335 (1980), the amended motion argued that McGinty need not show any prejudice resulting from Brown and Norton's performance because an actual conflict of interest adversely affected their performance. In an affidavit attached to the amended motion, McGinty stated that Brown and Norton "never reviewed the discovery with [McGinty] that mentioned their names in the FBI 302s as possible witnesses, suspects or targets in the corruption investigation." McGinty further asserted that he "would never have consented to a Waiver of Conflict as it relates to Jay Norton and Alan Brown's personal conflict of interest in this case." In an affidavit

---

[3] McGinty further based this argument on our statement in *Beets v Scott* that "a powerful argument can be made that a lawyer who is a potential co-defendant with his client is burdened by a 'multiple representation' conflict that ought to be analyzed under *Cuyler*." 65 F.3d 1258, 1271 n.17 (5th Cir. 1995) (en banc).

submitted with his reply brief, McGinty attested that, if he had conflict-free representation, he would have gone to trial.

The district court denied McGinty's motion. Rejecting McGinty's invocation of *Cuyler*, the court held that McGinty's ineffective assistance of counsel claim should be considered under the familiar, and more arduous, standard announced in *Strickland v. Washington*, 466 U.S. 668 (1984). According to the district court, McGinty's motion failed both *Strickland* prongs; he failed to show that his counsels' performance fell below an objective standard of reasonableness or that the purported conflict prejudiced his defense. The district court granted a certificate of appealability, and McGinty now appeals.

## II.

A federal prisoner may be afforded relief under § 2255 if his "sentence was imposed in violation of the Constitution." 28 U.S.C. § 2255(a). The Sixth Amendment guarantees criminal defendants the right to effective assistance of counsel. *Yarborough v. Gentry*, 540 U.S. 1, 5 (2003). This right "includes the 'right to representation that is free from any conflict of interest.'"*United States v. Hernandez*, 690 F.3d 613, 618 (5th Cir. 2012) (quoting *United States v. Garcia-Jasso*, 472 F.3d 239, 243 (5th Cir. 2006)); *see also Cuyler*, 446 U.S. at 345, 348. A defendant is entitled to effective counsel at all "critical stages of a criminal proceeding," including entry of a guilty plea. *Lee v. United States*, 137 S. Ct. 1958, 1964 (2017) (quoting *Lafler v. Cooper*, 566 U.S. 156, 165 (2012)).

In an appeal from denial of a § 2255 motion, the court reviews legal conclusions de novo and factual findings for clear error. *United States v. Batamula*, 823 F.3d 237, 239–40 (5th Cir. 2016) (en banc). A district court may deny a § 2255 motion without conducting an evidentiary hearing "only if the motion, files, and records of the case conclusively show that the prisoner is

entitled to no relief." *United States v. Bartholomew*, 974 F.2d 39, 41 (5th Cir. 1992). Denial of an evidentiary hearing is reviewed for abuse of discretion. *Id.*

A.

The government brings as a threshold argument, persuasive to us, that, even if McGinty's attorneys were constitutionally deficient, McGinty waived his right to non-conflicted counsel. "[W]e have long held that, like the right to counsel of any kind, the right to conflict-free counsel can be waived." *United States v. Greig*, 967 F.2d 1018, 1021 (5th Cir. 1992). Waiver is effective when it is "knowingly, intelligently, and voluntarily done." *Id.*

Despite this general rule, not all conflicts are waivable, and McGinty asserts that the conflict he alleges is unwaivable. *See, e.g., United States v. Vaquero*, 997 F.2d 78, 90 (5th Cir. 1993) (stating that no waiver is effective where a conflict "is so severe as to render a trial inherently unfair [such that] the integrity of the judicial system has been undermined, and the accused has been deprived of his right to effective assistance of counsel."). The government responds that, even if Brown and Norton's conflict would have been unwaivable if timely raised before the district court, an exception exists where the defendant knows of the conflict, keeps the district court in the dark, and later seeks to invalidate his conviction based on the alleged conflict. We agree.

We have generally recognized that a defendant may "waive his right to independent counsel . . . by intentionally, and in bad faith, pursuing a course of action deliberately designed to lay a groundwork for reversal." *United States v. Alvarez,* 580 F.2d 1251, 1260 (5th Cir. 1978). Echoing this sentiment, other circuits have found that defendants waived conflicts similar to that at issue here.

In *Bridges v. United States*, Bridges alleged in a § 2255 motion that he and his attorney had committed a litany of crimes together. 794 F.2d 1189,

1191–92 (7th Cir. 1986). Among other things, Bridges asserted that he supplied cocaine to his attorney and that his attorney had bribed a state court judge on his behalf to secure acquittal on an earlier charge. *Id.* The Seventh Circuit held that Bridges implicitly waived any conflict. *Id.* at 1195. It noted that Bridges "had all the information long before entering his guilty plea" and nonetheless chose to trust his attorney despite the attorney's "known untrustworthiness." *Id.* at 1194. Given Bridges' superior knowledge, the court refused to permit him to "take advantage of the criminal justice system by sort of salting away and saving, through what alone he knows, something he thinks will vacate and render null and void a long, tortuous criminal justice procedure that is undertaken in good faith by other parties." *Id.* at 1195.

The Fourth Circuit considered a similar § 2255 motion in *United States v. Reckmeyer*, 900 F.2d 257 (4th Cir. 1990) (table decision). There, Reckmeyer learned that he was the target of a grand jury investigation and retained counsel. *Id.* at *1. When Reckmeyer divulged the scope of his drug trafficking operation, his attorney substantially increased his fee and knowingly accepted payment by fraudulent cashier's checks and money that had been smuggled into the country. *Id.* at *1–2. As Reckmeyer attempted to move cash into the country to pay his inflated legal fees, one package was intercepted by authorities. *Id.* at *2. This attempted smuggling was later listed as an overt act in Reckmeyer's eventual indictment. *Id.* Emphasizing that "Reckmeyer must have known that [his attorney] was self-interested and that his self-interest could run counter to Reckmeyer's," the court held that Reckmeyer waived any conflict of interest. *Id.* at *6–7. Because Reckmeyer "inevitably understood and accepted the conflict," he knowingly and intelligently waived it by choosing to proceed with his coconspirator as counsel. *Id.* at *6.

We agree with the conclusions of the Seventh and Fourth Circuits. Whether McGinty could have waived an attorney conflict of this nature had it been disclosed in district court is not before us. We must instead assess whether any alleged error was waived when this issue was raised for the first time in a post-conviction proceeding. Failing to find that such a conflict is waivable "would be to condone the knowing complicity of defendants in conflict-creating misconduct of their counsel while preserving as an anchor to windward the claim of a constitutional violation resulting from that misconduct." *Id.* at *7.

## B.

We therefore turn to whether McGinty did, in fact, voluntarily, knowingly, and intelligently waive Norton and Brown's alleged conflict. When a defendant opts to proceed with his chosen counsel in the face of a known or suspected conflict, district courts in this circuit must "address each defendant personally and forthrightly advise him of the potential dangers of representation by counsel with a conflict of interest." *United States v. Garcia*, 517 F.2d 272, 278 (5th Cir. 1975), *abrogated on other grounds by Flanagan v. United States*, 465 U.S. 259 (1984). It is undisputed that the district court held no *Garcia* hearing regarding the conflict at issue here. The government argues that, despite the lack of a formal hearing, the record shows a knowing, intelligent, and voluntary waiver.

Although this appears to be the first time we have considered an implicit waiver of an attorney conflict, we have upheld analogous waivers. When a defendant wishes to waive his right to counsel and proceed pro se, "a colloquy between a defendant and a trial judge is the preferred method of ascertaining that a waiver is voluntary, knowing, and intelligent." *Wiggins v. Procunier*, 753 F.2d 1318, 1320 (5th Cir. 1985). But such a colloquy, though preferred, is not

required. *Id.*; *see also Neal v. Texas*, 870 F.2d 312, 315 n.3 (5th Cir. 1989) ("Neal argues that because the trial court failed to conduct a 'waiver of counsel' hearing, any purported request to waive counsel could not have been knowingly and intelligently made. Neal misperceives the law of this circuit. There is no constitutional requirement for such a hearing or dialogue."). Instead, in such cases, "the proper inquiry is to evaluate the circumstances of each case as well as the background of the defendant." *Wiggins*, 753 F.2d at 1320. The same is true here.

The undisputed record reveals that McGinty waived the alleged conflict he now asserts. The aim of a *Garcia* hearing is to "ensure that the defendant (1) is aware that a conflict of interest exists; (2) realizes the potential hazards to his defense by continuing with such counsel under the onus of a conflict; and (3) is aware of his right to obtain other counsel." *Greig*, 967 F.2d at 1022. The record shows that McGinty's knowledge satisfied all three prongs.

There is little doubt that the latter two requirements are met. Over his decades-long career as an attorney, McGinty worked as a prosecutor, a criminal defense attorney, and a judge.[4] *See Neal*, 870 F.2d at 315 (upholding waiver of counsel made "by an experienced criminal lawyer, who for four years had been a district attorney" despite lack of colloquy); *United States v. Roth*, 860 F.2d 1382, 1389 (7th Cir. 1988) ("Roth's waiver was valid. He has been a lawyer for more than 20 years and knows what conflicts of interest are and their consequences."); *see also Garcia*, 517 F.2d at 277 n.5 ("The determination of whether there has been an intelligent waiver of right to counsel must depend, in each case, upon the particular facts and circumstances surrounding

---

[4] McGinty unconvincingly attempts to downplay his experience by pointing out that he worked in the state, not federal, criminal justice system. But, of course, the Sixth Amendment right to conflict-free counsel applies in both.

that case, including the background, experience, and conduct of the accused."). Even if McGinty's experience somehow left him ignorant to the risk of conflicts and his right to unconflicted counsel, the district judge brought those points home when he conducted a *Garcia* hearing regarding Brown's concurrent representation of Aranda.

The uncontested record also shows that McGinty was aware of the alleged conflict. The government asserts, relying on an affidavit from an FBI agent, that McGinty told investigators that Brown and Norton had given him favors in exchange for favorable rulings in the past. Specifically, for example, McGinty admitted to receiving an envelope of cash from Brown after a favorable ruling. He stated that he gave his lawyer a favorable ruling in exchange for a gift. McGinty does not affirmatively embrace these prior statements, but neither does he dispute them. And McGinty's brief before this court affirmatively cites as fact other parts of the same FBI agent affidavit that recounts his allegations of collusion with Brown and Norton.

McGinty cannot create an issue of fact by dancing around his own statements. "Contested fact issues in § 2255 cases must be decided on the basis of evidentiary hearings." *United States v. Kayode*, 777 F.3d 719, 732 (5th Cir. 2014) (alteration omitted) (quoting *Reagor v. United States*, 488 F.2d 515, 517 (5th Cir. 1973)). But *uncontested* fact issues, for obvious reasons, do not merit the same treatment. Because McGinty failed, despite ample opportunity, to contest the veracity of his own prior statements of collusion with Brown and Norton, the district court and we are entitled to rely on them. *See, e.g., Gregory v. Polk*, No. 05-20, 2006 WL 1877262, at *5 (4th Cir. July 7, 2006) (affirming denial of habeas petition without evidentiary hearing based in part on petitioner's earlier, uncontested statement). We therefore have no trouble concluding that, if McGinty's attorneys had a conflict, the uncontested facts

show that McGinty opportunistically knew, even took advantage of, that fact better than anyone. Whether or not that approach was ultimately wise, the record shows that it was intelligent, knowing, and voluntary. Accordingly, we hold that McGinty waived Norton and Brown's purported conflict.

## C.

One final point is worth comment. Though the government now downplays the extent of its knowledge, the government was aware of at least a potential conflict in McGinty's representation. We take this opportunity to remind prosecutors that the prudent course in a case like this is promptly and fully to disclose a potential conflict to the district court. After all, "[w]hen an attorney discovers a possible ethical violation concerning a matter before a court, he is not only authorized but is in fact obligated to bring the problem to that court's attention." *In re Gopman*, 531 F.2d 262, 265 (5th Cir. 1976). That is especially true where, as here, the relevant material has already been disclosed to the allegedly conflicted counsel, so there is no danger of undermining the investigation. Few defendants are as sophisticated as McGinty, and many could have less knowledge of their attorneys' alleged misdeeds.

## III.

The judgment of the district court is AFFIRMED.