**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Bruce ROTH, Defendant–Appellant.**

**No. 87–2611, 88–1519.**

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 28, 1988.

Decided Oct. 26, 1988.

As Amended on Denial of Rehearing
Dec. 6, 1988.

---

William VanDercreek, Dallas, Tex., for defendant-appellant.

Stephen P. Sinnott, Asst. U.S. Atty., Anton R. Valukas, U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Before CUDAHY, POSNER and EASTERBROOK, Circuit Judges.

EASTERBROOK, Circuit Judge.

Bruce Roth, the defendant in this Greylord prosecution, was a crooked lawyer. He made a living bribing crooked judges. Often Roth played the broker's role, matching lawyers who did not know which judges would take money with judges who did not know which lawyers would pay it. For these services he has been convicted of violating the Hobbs Act, 18 U.S.C. § 1951, and the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961–68; he was sentenced to 10 years in prison. The only substantial issues, the only ones we discuss, are whether Roth waived his right to conflict-free defense counsel and whether serving as bagman to three judges amounts to "association" with the court for purposes of RICO.

I

With a federal judge's approval, the Greylord investigators installed a microphone in the chambers of Wayne Olson, a judge of the Circuit Court of Cook County. The first day the bug was used, it picked up a conversation between Olson and Roth. Roth asked Olson whether Elsie, the secretary to the Chief Judge of the Circuit Court, would accept money to assign a felony case to a judge Roth preferred (doubtless because the judge also was on the take). Olson did not know; Roth suggested that Dean Wolfson, another corrupt lawyer, might. The conversation continued:

OLSON: ... I'll ask Dean if he can do it.

ROTH: Would you do that if you remember Judge?

OLSON: I'll—you—I'll tell you what, he's not, he's gonna be here tomorrow morning. I'll tell what I'll do. I'll, I'll say Dean I heard, that over, here's what I heard that Elsie takes dough. Now Dean, you know that he's gonna tell me the truth. He's either gonna say yes, he's gonna say no, or he's gonna say I don't believe it. I never heard of that. But he's gonna be legit with me. I'll ask him tomorrow morning.

ROTH: Could you remember I'd appreciate it.

OLSON: Oh, I'll remember cause it's interesting to me.

ROTH: You got, you got me, I think I'll be back Wednesday anyway.

OLSON: I love people that take dough, cause you know exactly where you stand.

ROTH: Sure, that's the way to do business.

OLSON: {Laughs}

The easy familiarity with the judge in such ex parte conversations could not have been spontaneous. Yet Roth and Olson had not then reached their own financial modus vivendi. Wednesday came, and Roth appeared to represent two criminal defendants. Olson directed three more to Roth. During a recess Roth stopped by Olson's chambers again.

OLSON: [T]he state was going to drop the charges. I asked them if they had a lawyer Kales. They said no we don't want Kales. You go talk to them.

ROTH: Dancy and Brooks?

OLSON: There's 400 for us {inaudible}. Tell them you're a lawyer and the judge asked you to talk to 'em.

ROTH: Thank you Judge {inaudible}.

OLSON: Did you get that other one?

ROTH: Yeah, I think so. I haven't finished talking to {inaudible}.

There was "400 for us" in the representation because once the defendants were free (assured since the prosecutor planned to drop the charges) the judge could assign to Roth the "cash bond refund" owed to them. In Illinois defendants post with the court 10% of the appearance bond. If they show up as required, the court refunds this money less a fee; the court can direct the refund to the lawyer to cover legal costs. The lawyer can funnel part of the refund to the judge for services rendered—either steering the case to the lawyer, or changing its outcome. This method of bribery has been a staple of the Greylord prosecutions. E.g., *United States v. Murphy*, 768 F.2d 1518, 1526–27 (7th Cir.1985); *United States v. Blackwood*, 768 F.2d 131 (7th Cir.1985); *Ward v. United States*, 845 F.2d 1459 (7th Cir.1988). Judge Olson shortly dismissed the cases in question and ordered the court to remit the defendants' money to Roth. There followed a negotiation in Olson's chambers:

ROTH: Cleared 765 for the day {inaudible}. I gave you a deuce [$200]. If it's not enough just tell me. Whatever the deal is. What's the deal {inaudible}?

OLSON: I got a guy who gives me half of what he gets.

ROTH: Fine.

OLSON: But I'd rather do business with you.

ROTH: Fine. No problem.

OLSON: But the problem is see, the problem is that he's here everyday. It's just some days I get nothing. It's a shame to have a guy come here and not have anything.

ROTH: Well I couldn't come everyday {inaudible}.

OLSON: When you're here I'll give you what I, everything I can.

ROTH: Fine. Let me know {inaudible} I cleared 765.

OLSON: Another one [$100] is fine.

ROTH: Alright.

. . . . .

ROTH: I got a case next week in Evanston, a big dope case in the 2nd District, 10 G's {inaudible} ... ten grand we're talking to get rid of it. {inaudible} case.

OLSON: I didn't think you could drop in the 2nd District.

ROTH: Ah there's a couple people out there {inaudible}.

There were indeed judges in the Second District willing to take bribes, and the business there was too lucrative to permit Roth to appear daily before Judge Olson. Scooping up cash bond refunds from Wayne Olson was small beer compared to the rewards of serving as broker and bagman for Judge Alan Lane of that district. The evidence, taken in the light most favorable to the jury's verdict, shows that in one armed robbery case Judge Lane told defense counsel he had "a pretty good motion" to suppress the defendant's confession but appeared reluctant to grant it. Lane told counsel to "call Bruce Roth", a direction counsel construed (correctly) as a demand for a bribe to be paid through Roth. The discussion between defense counsel and Roth revealed that Roth and Lane had discussed the case and that Lane would like to "help out" the defendant but was "not a charitable man". After Roth received $2,000 as Lane's agent, the judge suppressed the confession. Roth then collected another $2,000 to ensure a favorable outcome on the merits—a payment that turned out to be unnecessary when the state elected not to proceed without the suppressed evidence. Roth and Lane did not refund the second $2,000.

Roth and Lane were a durable pair, and the arrangement was lucrative. Roth managed to have the case of Rocco Filliponio (involving cocaine and a machine gun) transferred from an honest judge to Lane, who acquitted the defendant in exchange for some $15,000. Roth took home an additional $10,000 as his fee. In still another case, Lane had convicted Michael Davis of several felonies, including rape. Roth, who had nothing to do with the case so far, dropped in on Davis in jail and told Davis that for $10,000, half for Lane and half for Roth, he could ensure success in post-trial motions. Roth later called Davis's girlfriend and told her curtly that she must produce $10,000 if she ever wanted to see Davis again.

Arrangements with Judge Adam Stillo called for still larger sums. Three persons were charged with selling cocaine to an undercover agent. Roth represented one. Judge Stillo acquitted Roth's client and convicted the two others. Roth offered to pitch in on behalf of the convicted defendants—if they would pitch in $25,000 apiece for Judge Stillo and "a contact". Roth told them it was too late to get an acquittal, but that money could palliate things. Stillo "doesn't read case law", Roth said, but knows that money talks. On the morning Judge Stillo was scheduled to rule on post-trial motions, one of the two convicted defendants delivered $25,000 in $100 bills to Roth's secretary. The secretary received a call from Joe Stillo, Judge Adam Stillo's nephew. The secretary said: "The papers are in order." Judge Stillo sentenced the paying defendant to three years' probation; the non-paying defendant was sent to jail for six years.

## II

Roth obviously needed a good lawyer. He hired Patrick Tuite, one of Chicago's leading criminal defense attorneys and the engineer of the only total acquittal that had then been obtained in any Greylord prosecution. Tuite represented several judges and lawyers in connection with charges of corruption, and at the time Roth hired him Tuite had been retained by others under investigation. This created potential conflicts of interest. Roth might find it in his interests to strike a deal with the prosecutors, who would require Roth to sing for his supper. Roth's information might inculpate one or more of Tuite's other clients. Tuite therefore said that he could not represent Roth in connection with a plea bargain; Roth agreed to this condition. Tuite properly called the potential for conflict to the attention of the court. Judge Getzendanner then questioned Roth—formerly a state prosecutor, and a member of the bar for more than 20 years—abut his understanding of the situation.

The prosecutor expressed concern that in state court Tuite had represented co-de-

fendants of both Filliponio and Davis, who were to testify for the government. In the Filliponio case, a trial for conspiracy to commit perjury, Roth himself had been among the defendants. The prosecutor wanted to be sure that Roth understood that Tuite might have learned secrets on which he would be forbidden to capitalize in defending Roth. Tuite told Judge Getzendanner that he had learned nothing that would affect or curtail his cross-examination of Filliponio and Davis. Roth informed the court that he had discussed these matters with Tuite "at some great length, and I am well aware of all of the potential conflicts. And I don't believe are there [sic] any conflicts. And if there were some potential conflicts I would certainly waive any potential conflicts."

Judge Getzendanner persisted. She asked Tuite about the effects of his representation of other Greylord defendants and suspects. Tuite said: "I'm not exactly sure all of the things that would come up. But I represent so many people in these investigations, there's always potential conflict." Roth stated that he understood his right to conflict-free representation and again stood on his choice of attorney.

Two things went unremarked. First, Judge Getzendanner did not expressly warn Roth that if the best strategy at trial called for blackening the reputation of another of Tuite's clients, or trying to pass the buck to him, Tuite could not ethically participate in the maneuver. Second, no one mentioned that Tuite was himself under investigation by the Attorney Registration and Disciplinary Commission of Illinois on account of money given to a judge. Tuite had prosecuted or defended many a case before judges who later were charged with taking bribes, e.g., *Branion v. Gramly*, 855 F.2d 1256 (7th Cir.1988), and was friendly with several. In 1982 he loaned $5,000 to Richard LeFevour, then Presiding Judge of the First Municipal Division of the Circuit Court, supposedly to help LeFevour pay his income taxes. LeFevour did not sign a note and did not repay until 1985, when he was indicted for taking bribes and wanted Tuite to defend him. (The defense was unsuccessful. *United States v. Le-*

*Fevour*, 798 F.2d 977 (7th Cir.1986).) Even then LeFevour repaid without interest. Tuite had no cases before LeFevour. The Disciplinary Commission recommended that Tuite be censured for giving a judge a thing of value. Tuite's defense was that he did not know it is forbidden to do so. Although finding that Tuite had violated Disciplinary Rule 7–110(A) ("A lawyer shall not give or lend any thing of value to a judge, official, or employee of a tribunal, except that a lawyer may make a contribution to the campaign fund of a candidate for such office."), the Supreme Court of Illinois discharged him without sanction on the ground that the rule had not been authoritatively construed in earlier cases. *In re Corboy*, 124 Ill.2d 29, 124 Ill.Dec. 6, 528 N.E.2d 694 (1988).

Roth contends that the investigation shows that Tuite may have had a reason to pull punches at the trial. If he was *too* vigorous, Roth contends, he might have annoyed the prosecutors; grouchy prosecutors might have wondered whether this loan was in reality a bribe, and started a criminal investigation of Tuite. Roth says that he detects signs of lackadaisical work in Tuite's handling of the trial, and that in particular Tuite's failure to call Roth as a witness in his own defense must be attributable to a conflict—either to avoid eliciting from Roth evidence that could damage other clients or to avoid the enmity of the prosecutor. In particular, Roth believes, Tuite kept him from testifying in order to prevent the prosecutor from cross-examining him about bribes to Judge John McDonnell, one of Tuite's clients who was then a target of the ongoing investigation. (McDonnell has since been indicted.) To cap things off, Roth points out that as soon as Roth was convicted and was called before the Greylord grand jury, Tuite took his leave, for he could not represent one who might injure another client; so too with Roth's testimony at trial, Roth submits.

After his conviction, Roth filed a motion for a new trial based on this conflict. The motion was assigned to Judge Marshall, Judge Getzendanner having resigned in the

interim. Judge Marshall declined to hold a hearing to investigate the conflict more fully and denied the motion for a new trial. The only concrete claim of prejudice stemmed from the decision not to put Roth on the stand. Judge Marshall pointed out that during trial Judge Getzendanner forcefully told Roth that he was entitled to testify in his own defense. Roth waived his right on the spot and did not suggest that he wished to testify but that Tuite had talked him out of it or declined to assist him. The ensuing conviction may have led Roth to take a different view of things, but that was hardly a ground for a new trial, Judge Marshall concluded. Any remaining conflicts were adequately covered during the hearing before Judge Getzendanner, he ruled, because Roth waived all conflicts, actual and potential.

■ Roth's contention that in order to protect Judge McDonnell, Tuite prevented him from testifying amounts to the claim that he twice was less than candid with the court: once when he told Judge Getzendanner that his decision not to testify was his own, and once when (after his conviction) he told the Greylord grand jury that he had never given money to Judge McDonnell. Tuite would not have had a conflict if Roth were prepared to testify at trial that he had not paid off Judge McDonnell. We see no reason to allow Roth to treat his declarations so lightly—and this even though in still further appearances before the grand jury Roth has sung still another tune. His statement at trial, and his initial testimony before the grand jury, show that there is no reason to suppose that Tuite feared his testimony. Roth does not suggest that Tuite anticipated that Roth would inculpate McDonnell on the stand, had he testified, and unless he would have done so, Tuite had no conflict. Roth appears to be playing games with the judicial system, telling Judge Getzendanner and the Greylord grand jury one thing, then changing his story when that suits his purposes. A judge is entitled to hold a defendant to statements made in open court and need not give him a hearing so that he may more readily contradict himself. *United States v. Ellison*, 835 F.2d

687, 693 (7th Cir. 1987). The tune Roth was singing at (and shortly after) trial showed that there was no conflict. If it were easy to take back such statements, as Roth tries to do, judgments could not be final. The trial is the forum to which a defendant must present his claims; he may not tell one story to the trial judge and then complain on appeal that the judge believed him. Judge Getzendanner was entitled to take Roth seriously, even though (he now tells us) he had his fingers crossed behind his back.

Only the validity of the original waiver need concern us. Roth's argument takes a familiar form. True, he says, I waived all conflicts, actual and potential. But the waiver was not voluntary because I did not know about all potential conflicts. Waiver is an intentional relinquishment of a known right. By definition, one cannot relinquish a right when one does not know salient facts. Worse, the information that led me to waive my rights came from Tuite; since he had a conflict, he was not a reliable source of information, rendering my waiver invalid unless the judge made everything clear in court. Yet the judge did not mention all possible forms of conflict. Therefore, the argument concludes, the waiver was ineffectual.

This is a familiar argument because it is available after every waiver, no matter how detailed the warnings preceding the waiver. We do not require a judge to follow a script in eliciting waivers of this sort. It is therefore always possible to say that the judge could have mentioned one more thing. Any conflict serious enough to call for reversal in the absence of waiver will have several facets and potential consequences. Hearings to flush them all out would be extended—and even then would be incomplete.

The right question, though, is not whether the judge told the defendant everything. No choice of any kind is made with perfect information, and hindsight always turns up some additional snippet. The question is whether the defendant knew enough to make the choice an informed one—a rational reconciliation of risks and gains that are in the main understood. A choice may be intelligent and voluntary in this sense even

though made without potentially-important information. *Moran v. Burbine*, 475 U.S. 412, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986), shows this. Burbine had been arrested and was under interrogation. The police knew, but did not tell Burbine, that a lawyer retained by his sister was trying to get in touch with him. Burbine confessed, and the Court concluded that the confession was voluntary because he understood his entitlements and what it means to confess. "No doubt the additional information would have been useful ...; perhaps even it might have affected his decision to confess. But we have never read the Constitution to require that the police supply a suspect with a flow of information to help him calibrate his self-interest in deciding whether to speak or stand by his rights." 475 U.S. at 422, 106 S.Ct. at 1142.

There are of course several meanings of "waiver". Courts use this word to reflect a variety of degrees of knowledge. See *Johnson v. United States*, 838 F.2d 201, 204 (7th Cir.1988). Sometimes simply knowing the existence of the right is enough. We say, for example, that a defendant waives his right to trial by jury if he is aware that the right exists yet opts for a bench trial (or pleads guilty); we do not insist that he have present to mind the complex strategic and tactical differences between bench and jury trials, and the consequences these may have for his fate. See *United States ex rel. Williams v. DeRobertis*, 715 F.2d 1174 (7th Cir.1983). Courts require more when the right in question is the right to counsel, *Johnson v. Zerbst*, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938); *Von Moltke v. Gillies*, 332 U.S. 708, 724, 68 S.Ct. 316, 323, 92 L.Ed. 309 (1948) (plurality opinion), or the right to counsel free from conflict of interest, *Cuyler v. Sullivan*, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980). The difference stems from the role of counsel: the lawyer rather than the court is the principal source of advice about rights and their use (or relinquishment). *Moran* cannot be distinguished on this ground, however, because it was about access to legal assistance.

Even when the right to counsel is at stake, courts may accept the defendant's waiver so long as they know that he understands the kinds of risks involved and has a reason for making his choice. Any more stringent standard imprisons a defendant in his privileges. If warnings must. be elaborate and comprehensive after the fashion of a prospectus in a securities offering, it is correspondingly easy to escape from the waiver after trial. Neither judges nor prosecutors want to offer the defendant two trials per case. They would predictably decline to allow waivers in some percentage of cases, which *Wheat v. United States*, — U.S. —, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988), says they can do. The more stringent the warning rules, the easier it is to obtain a reversal after a conviction; the easier it is to obtain a reversal, the more judge and prosecutor will resist the attempt to waive; the more they resist, the harder it is for the defendant to obtain the services of the lawyer he prefers. Roth now invokes *Wheat* for the proposition that because a court *may* decline to allow representation by a lawyer with a conflict of interest, sometimes (and here) the court *must* do so, or at least conduct an exceedingly rigorous interrogation before accepting the waiver. The right to conflict-free counsel may be waived, *Holloway v. Arkansas*, 435 U.S. 475, 483 n. 5, 98 S.Ct. 1173, 1178 n. 5, 55 L.Ed.2d 426 (1978). The Supreme Court held in *Wheat* that a court may reject a proffered waiver, in part to prevent the strategy Roth now pursues: first waiving the right and then taking back the waiver after conviction. 108 S.Ct. at 1698. None of the language in *Wheat* suggests that the Court was enlarging the defendant's arsenal of rights; and if we were to read *Wheat* the way Roth prefers, that would in the long run reduce defendants' entitlements by making waivers more difficult, which would induce courts to deny defendants the services of the lawyers they prefer.

So we adhere to the rule that has long prevailed in this circuit. A judge should inform the defendant of the nature and importance of the right to conflict-free counsel, and ensure that the defendant understands something of the consequences

of a conflict and his entitlement to conflict-free counsel, but the waiver is not like the signature on a bond indenture. It is enough that the defendant knows the types of risks at stake and acts "with open eyes". *United States v. Beniach*, 825 F.2d 1207, 1210 (7th Cir.1987). A waiver given after such knowledge is binding. *Bridges v. United States*, 794 F.2d 1189, 1194 (7th Cir.1986); *United States v. Levine*, 794 F.2d 1203, 1206 (7th Cir.1986); *United States v. Cirrincione*, 780 F.2d 620, 627 (7th Cir.1985); *United States ex rel. Tonaldi v. Elrod*, 716 F.2d 431, 438–39 (7th Cir. 1983). More extensive discussions may be useful, and we encourage them. The district judge knew that Tuite represented other Greylord defendants, and it would have made for a more intelligent choice—and not incidentally have eliminated the need for these appellate proceedings—if the judge had gone into greater detail. Extended colloquys are not, however, necessary conditions of valid waivers. "We do not intend ... to condone [an] effort by [a defendant] to benefit from his own informed choice of an attorney. It smacks of bad faith and of a deliberate design to lay a groundwork for this appeal when all else had failed." *Bridges*, 794 F.2d at 1194.

■ Roth's waiver was valid. He has been a lawyer for more than 20 years and knows what conflicts of interest are and their consequences. He knew that Tuite represented other Greylord defendants and suspects—Tuite's experience was what made him attractive. Tuite said in court that he would not do anything that jeopardized other clients. Roth may not have known who those clients were, but (a) he could have asked, and (b) with the McDonnell business out of the way, none of them was pertinent to the charges against Roth. Roth does not contend that he inquired and that Tuite balked, or anything similarly troubling. Tuite's loan to LeFevour had been discussed in the press before Roth's trial. The prosecutor and judge knew no more about it than Roth did. A lawyer might pull punches to avoid investigation by the prosecutor, but the investigation in question was not being conducted by the federal government, and it was removed from the focus of Greylord. (The prosecutor assured us at oral argument that the United States Attorney has not opened an investigation of Tuite, and Roth does not contend that the FBI ever did so.) Tuite's loan had nothing to do with any pending case and therefore was at worst an unseemly effort at ingratiation rather than a quid pro quo, so that prosecution was unlikely. A prosecutor might like to have defense counsel at his mercy, but that is not a reasonable description of these events. Roth hired Tuite because he was an insider in the Cook County courts and knew the Greylord business stem to stern; that Tuite might have become too tight with state judges for his own good does not undermine the voluntary quality of Roth's choice.

■ If we were to assume that Roth's waiver did not encompass undisclosed potential conflicts or the state's investigation of Tuite, this would make no difference because Roth has not established that the potential conflict became actual and adversely affected trial counsel's performance. See *Cuyler*. Neither Tuite's representation of Judge McDonnell nor the Disciplinary Commission's investigation of Tuite created an actual conflict adversely affecting Tuite's ability to defend Roth zealously. Actual conflicts that adversely affect counsel's performance must be established by specific instances in the record. *Cirrincione*, 780 F.2d at 629. The possibility of divided loyalties is insufficient proof of actual conflict, *id.* at 630 n. 4; rather, the defendant must show specific instances where his attorney "could have, and would have, done something different." *Id.* at 630–31. See also *United States v. Horton*, 845 F.2d 1414, 1418–19 (7th Cir.1988) (claim that defense lawyer might have pulled his punches because he was under consideration for appointment as United States Attorney does not demonstrate a conflict of interest). Even if Roth's decision not to testify was based on Tuite's advice, which is unlikely, there is no evidence beyond Roth's conjecture that the advice was the product of an actual conflict rather than the product of a prudent defense strategy.

## III

RICO makes it a crime to "conduct or participate" in the affairs of an "enterprise" through a pattern of racketeering. 18 U.S.C. § 1962(c). The parties stipulated that the Circuit Court is an "enterprise" for purposes of RICO, but Roth obviously did not conduct its affairs. The indictment charged that he participated in its affairs by bribing judges and serving as their collection agent. The "participation" aspect of the RICO crime often is known as "association" with the enterprise. The district judge instructed the jury "as a matter of law that a person who solicits or accepts bribe money on behalf of a Circuit Court judge is associated with the Circuit Court of Cook County." Roth contends that this instruction is incorrect.

 Roth objected to this instruction at trial, but without details. Fed.R.Crim.P. 30 states: "No party may assign as error any portion of the charge . . . unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which that party objects and the grounds of the objection." An objection must state grounds; "I object" is not enough. The rule ensures that the district judge will be alerted to the nature of the problem, so that error may be averted. An objection that does not point out the problem in the instruction is insufficient because it does not give fair prospect of timely correction. See, e.g., *United States v. Markowski*, 772 F.2d 358, 362–63 (7th Cir.1985); *United States v. Kehm*, 799 F.2d 354, 362–63 (7th Cir.1986). Counsel here stated:

> We had one objection to the government's instructions . . . which has to do with association with the Circuit Court based on our position that Mr. Roth was not associated with the Circuit Court. . . . [W]e are objecting to that on the grounds that we believe he is not associated.

This objection does not alert the court to a claim that the instruction is based on an incorrect appreciation of RICO. Counsel stated that it was the defense view that Roth "was not associated" with the court, which is essentially a plea for the court to resolve the issue in Roth's favor rather than put any question to the jury. If counsel wanted to preserve the point now pressed—that the definition of "association" should be left to the jury, or that other circumstances might be pertinent—he should have been more direct. If the objection was adequate, it was barely so.

 We need not decide whether this objection made the grade, however, because any error was harmless. The instruction did not take any factual issue away from the jury. It simply told the jury a legal consequence of a finding on a disputed fact. The court told the jury that *if* it should find that Roth had carried payments to judges, *then* Roth would be "associated" with the court for purposes of RICO. Under *United States v. Yonan*, 800 F.2d 164 (7th Cir.1986), participation in a bribery scheme is enough to make out "participation" in the affairs of the court, the statutory requirement. See also *Yellow Bus Lines, Inc. v. Drivers Union*, 839 F.2d 782, 792–94 (D.C.Cir.1988).

Roth might have had an argument that circumstances *other* than carrying the judges' money could be pertinent to the finding of "association"; if there are other legally relevant circumstances, the jury must consider them. We refrain from rambling through the wilds of RICO, for counsel did not suggest any such circumstance, and it is hard to imagine what one might be. Juries do not make up their own rules of law, and judges ought to tailor their instructions as close as possible to the facts of the case, the better to inform juries about what they must deliberate on, and what their conclusions mean. The bare possibility that in another case some other circumstance might negate "association" even when the defendant has served as a bagman is no reason to give an elaborate hypothetical instruction in this case. The instruction given dealt with the factual dispute these parties had, and it accurately stated the legal consequence of resolving this particular dispute in a particular way.

AFFIRMED.