UNITED STATES of America, Plaintiff–Appellee,

v.

Donald S. LOWRY, Defendant–Appellant.

No. 89–3618.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 27, 1992.

Decided Aug. 6, 1992.

K. Tate Chambers, Asst. U.S. Atty., argued, Peoria, Ill., for plaintiff-appellee.

Steven J. Plotkin, argued, Chicago, Ill., for defendant-appellant.

Before COFFEY and MANION, Circuit Judges, and SHABAZ, District Judge.*

COFFEY, Circuit Judge.

The facts in this case read like the plot outline of a prime time movie made to be shown during television's sweeps week. (Indeed, the district court ordered the bankrupt defendant to pay restitution "from the potential proceeds of any book/movie/TV or similar rights" he might obtain from telling all.) Of course, appellate judges seldom play a significant role in such productions, so we are free to concentrate on the task at hand, which is to determine whether the defendant's attorney was constitutionally ineffective, whether the government produced sufficient evidence of the defendant's intent to commit mail fraud, and whether the court applied the correct law in imposing sentence. We affirm the conviction and remand for resentencing only.

## I. BACKGROUND

In the early 1960s Donald Lowry published a book about his travels through Mexico entitled *Mexico: Bachelor's Paradise.* The response to the book convinced Lowry that there were many men out there who lacked self-confidence and had trouble with relationships, and that he could help these men by establishing a mail-order lonely hearts club. He followed through on this idea and founded such a club in 1965. After running this club for a few years, Lowry incorporated his business under the name of Col International, "Col" being an acronym for "Church of Love" (hereinafter "COL").

It is the premise of the COL that lends spice to the script. Using mailing lists acquired from men's magazines and various lonely hearts clubs, Lowry mailed informational packets to thousands of men describing the COL and its purpose. These letters claimed that the COL was founded in Mexico in 1965 by a teenage girl, Maria Simona Mireles, who now went by the name "Mother Maria". According to the letters Mother Maria had been called to establish a new Garden of Eden, a valley paradise to be known as "Chonda–Za". In Chonda–Za, COL members would join with Mother Maria and an entourage of beautiful young women known as the "Angels of Love", living the rest of their lives in utter peace and fulfillment. Neither Rome nor the Garden of Eden was built in a day, however, and at present Chonda–Za was still a shimmering dream, though progress was being made. In the meantime, the mailings revealed, Mother Maria and the Angels were living on an old farm near the western Illinois town of Hillsdale, frolicking in a bucolic encampment known as the

* Hon. John C. Shabaz of the Western District of Wisconsin, sitting by designation.

"Retreat". At the Retreat the Angels were purifying themselves for entry into Chonda–Za and perfecting a free and open pastoral lifestyle, uninhibited by the moral code and strictures that modern society places on male-female relationships. This would be the lifestyle enjoyed by all in Chonda–Za.

We wish to make it clear that neither Mother Maria, nor the Angels of Love, nor the Retreat actually existed. The COL and its customs were nothing but creations of Lowry's active and fertile imagination, but he neglected to make mention of this in any of his mailings. In fact, the COL operated out of a few rooms in a building in Moline, Illinois.

The lonely men targeted by these mailings were invited to join the COL, with a lifetime membership costing a mere thirty dollars.[1] After joining, members enjoyed all sorts of benefits, receiving a monthly newsletter called *The Templian*, which included self-help articles and news of the goings-on at the Retreat, and regular promotional letters, which included order forms for self-help booklets, photos of the Angels, or letters from the Angels. The photos were allegedly shots of the Angels living at the Retreat. Actually, however, they were pictures of coeds or models [2] in various stages of undress. The letters were allegedly personal notes from the Angels to individual COL members, and over the course of time many of these men came to be close pen pals with one or more Angels. But, since no Angels existed, these letters were actually written by Lowry or his employees. To maintain the illusion that the Angels actually existed, however, Lowry created a different background, personality, and writing style for each Angel (for example, some Angels wrote simple, All–American letters, others

(like Mother Maria) used broken English, and others used improper and off-color language). He also used different stationery for different Angels and even closed each letter with a false signature from the "authoring" Angel.

These personal letters and photos caused members to develop a close emotional attachment to the COL and to specific Angels. One man testified to sending over 1,500 letters to his favorite Angels; others left everything in their will to the COL; some planned to retire at Chonda–Za, or to drop everything and move there upon its completion; several purchased the station of "Temple Master", entitling them to sit at Mother Maria's side and have dominion over the Angels in Chonda–Za; a number planned to marry Angel Vanessa, who had been promised to multiple members; and large numbers accepted the letters' invitation to send "love offerings" (read "cash, checks, or goods") to the Angels, which would be reciprocated by the "fulfillment letters" described above.

More than this, Lowry's letters convinced members to put their money where their mouths (and hearts) were. The Angels, you see, had needs, and Lowry sent letters notifying the members of these needs and asking for their financial assistance. For example, the Angels needed money for "Mother Maria's Garden Fund", which they used to grow fruits and vegetables to tide them through the long Illinois winters. The Angels also needed funds to repair Angel Audrey's car, because she was the only Angel allowed to travel into town to purchase supplies for the Retreat. Further, emergency funds were solicited from time to time, as when Angel Susan allegedly was in an auto accident and necessitated hospitalization.[3] Other needs included:

---

1. The Presentence Report says a membership cost thirty dollars, but the plaintiff's brief states *that during the life of the COL memberships were sold for anywhere from five to twenty-five dollars, tracking inflation.* The exact price is irrelevant to our decision.

2. These women, who worked in Moline, Illinois or nearby cities, or attended local colleges, were not told that their pictures would be used for the COL's purposes, though they did sign releas-

es allowing the pictures to be used with fictitious names. They believed they were doing *legitimate modeling work.*

3. The woman whose pictures were used to depict Angel Susan actually was in an auto accident, but the details of the accident (time, place, and cause of the wreck) were fabricated to evoke more sympathy from the members. *See* n. 9, *infra.*

money to pay the taxes on the Retreat, a new motor for the water well at the Retreat, a surprise gift for Mother Maria, a new coat for Mother Maria, a vacation for the Angels, sewing machines, typewriters, and, last but not least, money to buy the property to build Chonda–Za.

The members responded generously, lest the dream of Chonda–Za be crushed by their parsimony. Between 1982 and 1985 Col International took in $4.5 million dollars. On top of that there were gifts galore—money, jewelry, stereos, food, clothing—so many that Lowry had no place to keep them and had to get rid of them by giving them to employees, holding a sidewalk sale, or selling at a store he opened called "Saver's Haven". Needless to say, the cash and the funds from the gifts went into Col International's coffers; the fictional Angels never demanded their due, and Lowry and his associates kept all the money.

The dream of Chonda–Za ended when Lowry learned that the COL was under investigation by federal authorities, but he broke the news gently. First, he informed the members that Mother Maria and the Angels were leaving the Retreat for a long vacation. A second mailing announced that they were not coming back, and Lowry shut down the COL. Nevertheless, Lowry, his wife, and his chief assistant, Pamala St. Charles, continued to contact COL members by forming successor organizations such as the International Order of Knights, which used the same tactic of targeting lonely men and soliciting funds.

On December 4, 1987, a twenty-count indictment issued, charging Lowry with seventeen counts of mail fraud (18 U.S.C. § 1341), one count of conspiracy to commit mail fraud (18 U.S.C. § 371), and two counts of using fraud proceeds to conduct a financial transaction (18 U.S.C. § 1956). After a nationally publicized trial in Peoria, Illinois a jury convicted Lowry on nineteen counts, and acquitted him on one count of mail fraud. Deciding that the crimes were not covered by the Sentencing Guidelines, the district court applied pre-Guidelines law, sentencing Lowry to a total of twenty-seven years in prison and ordering restitution to the victims of $94,450.00. The court structured its sentence as follows: consecutive five-year terms on mail fraud counts 1, 2, and 3; a consecutive five-year term for count 18, conspiracy to commit mail fraud; and consecutive three- and four-year terms for mail fraud counts 8 and 9. The court also imposed concurrent five-year terms on mail fraud counts 4, 5, 7, and 10, and suspended the sentences on the remaining counts.

## II. ISSUES

Lowry raises a number of issues in this direct appeal, arguing: (1) that he did not knowingly and intelligently waive his right to conflict-free counsel, (2) that his attorney's conflict of interest deprived him of his right to counsel, (3) that, regardless of any waiver, the trial court should have disqualified his attorney because of the conflict of interest, (4) that the evidence was insufficient to prove that he acted with specific intent to defraud, and (5) that his conspiracy conviction was covered by the Sentencing Guidelines, and so we should remand for resentencing.

## III. DISCUSSION

### A. Waiver of the Right to Conflict-free Counsel

The Sixth Amendment affords criminal defendants the right to counsel and, absent a conflict of interest or similar ethical problem necessitating disqualification, the right to privately retained counsel of their own choosing. *Wheat v. United States,* 486 U.S. 153, 158–59, 108 S.Ct. 1692, 1696–97, 100 L.Ed.2d 140 (1988); *United States v. Defazio,* 899 F.2d 626, 629 (7th Cir.1990). The Amendment also entitles defendants to representation by an attorney completely loyal to their cause, unfettered by any conflict of interest. *Cuyler v. Sullivan,* 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980); *United States v. Cirrincione,* 780 F.2d 620, 624 (7th Cir. 1985). At times, the right to choose one's own attorney and the right to be represented by an attorney with undivided devotion clash. For example, this problem often

arises where several co-defendants want the same attorney but have inconsistent defenses. *See Wheat*, 486 U.S. at 159, 108 S.Ct. at 1697. In such cases a defendant faces a difficult decision: either to waive the right to conflict-free counsel and stick with his initial choice, knowing that the conflict of interest might prevent his attorney from pursuing some strategic avenues,[4] or to refuse to waive the conflict and go to trial represented by his second choice. But we hasten to make it clear that the defendant is not the only one faced with a dilemma. The trial court, too, must consider the ramifications of its actions. If the court is alerted to a conflict of interest and disqualifies a defendant's attorney, the defendant may claim on appeal that he was deprived of the right to retain the counsel of his choice. If, on the other hand, the court accepts the defendant's waiver of his right to conflict-free counsel and allows him to proceed despite a conflict, the defendant may later claim that his waiver was invalid for some reason, and that an alleged conflict of interest rendered his counsel constitutionally ineffective. *See United States v. Roth*, 860 F.2d 1382, 1387 (7th Cir.1988) ("This is a familiar argument because it is available after every waiver, no matter how detailed the warnings preceding the waiver.") As the Supreme Court put it in *Wheat*, "trial courts face the prospect of being 'whip-sawed' by assertions of error no matter which way they rule." 486 U.S. at 161, 108 S.Ct. at 1698.

Still, a defendant can waive the right to conflict-free counsel and, "once having made a knowing and intelligent waiver, a criminal defendant may not later attack his conviction premised upon an assertion of conflict." *United States v. Beniach*, 825 F.2d 1207, 1210 (7th Cir.1987). Lowry clearly waived his right to conflict-free counsel,[5] but now claims that his waiver was invalid because it was not knowing and intelligent. A waiver is said to be knowing and intelligent if made with "sufficient awareness of the relevant circumstances and likely consequences." *Brady v. United States*, 397 U.S. 742, 748, 90 S.Ct. 1463, 1469, 25 L.Ed.2d 747 (1970). "The question

**4.** For example, the best defense for one defendant might be to downplay his role in an offense and attempt to shift most of the blame to a co-defendant. If that co-defendant is represented by the same attorney, however, that attorney's duty to the second defendant will in all probability prevent the attorney from vigorously representing the first defendant.

**5.** *See* R. 121, at 9–14 (Transcript of Hearing, Nov. 9, 1988). During his examination by the district judge, Lowry explicitly waived his right to conflict-free counsel three times.

THE COURT: Well, the situation is that—while you may not consider it to be fair—that you not know all the details of the investigation. You are not going to be able to know the details—

MR. LOWRY: No, of course not.

THE COURT: —of the investigation.

MR. LOWRY: This hasn't shaken my confidence in Jerry Schick.

* * * * * *

THE COURT: Speaking hypothetically, if you were to find later that he [Schick] was indicted and convicted of this offense, whatever it might be, are you in effect telling me at this point, without being able to read the future, to waive any rights you might have down the road to make a claim of ineffective assistance of counsel?

MR. LOWRY: I told Jerry we have come this far, we'll go the rest of the way.

THE COURT: I don't know that that answers my question. ... [A]re you telling me that you are prepared at this time to waive any claim that you might later have—

MR. LOWRY: Yes, sir, I am.

THE COURT: —to claim he was not effectively representing you as a result of the investigation?

MR. LOWRY: I am.

* * * * * *

THE COURT: .... I will ask it again just to be sure. Your reservation that you expressed based on the idea that you don't know all the details of this, it is clear that you won't know any more than you do now prior to the conclusion of your case. So you are really actually being asked to make this decision based on what you have described yourself ... as insufficient or less than complete information, but none the less I am asking you to make that decision. Is it your decision to waive any right that you might have later to complain about the ineffective assistance of counsel?

MR. LOWRY: It is.

THE COURT: Based on this situation?

MR. LOWRY: Yes, sir, it is.

THE COURT: And understanding that you do have incomplete information at this time?

MR. LOWRY: Yes.

is whether the defendant knew enough to make the choice an informed one—a rational reconciliation of risks and gains that are in the main understood." *Roth*, 860 F.2d at 1387; *see also Williams v. Meachum*, 948 F.2d 863, 866–67 (2d Cir.1991) ("[W]e will regard a waiver of conflict-free counsel to be knowing and intelligent when a defendant shows that he is aware of and understands the various risks and pitfalls [of retaining counsel with a conflict of interest, and] that he has the rational capacity to make a decision on the basis of this information.") (internal quotation marks omitted). Naturally, the inquiry is fact-intensive, and we must thoroughly examine the facts and circumstances of the case, "including the background, experience, and conduct of the accused." *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938).

Before deciding whether Lowry's waiver was valid, however, we must describe the alleged conflict of interest. This case is unique in that Lowry's attorney, William Schick, had a trio of potential conflicts of interest. First, he represented all of the defendants: Lowry, his wife Esther, Pamala St. Charles, and Col Incorporated. Multiple representation is a classic conflict of interest situation. *See Beniach*, 825 F.2d at 1209–10; *Cirrincione*, 780 F.2d at 624–25. Second, Schick had previously represented two Col employees in the same case. He helped these two, with the consent of the government, in obtaining immunity from prosecution, and prior to trial it appeared that both would testify for the prosecution, though only one actually did so. This presented a potential conflict of interest because it was possible that Lowry's cross-examination of these witnesses would be limited by the attorney-client privilege. In assisting these potential witnesses in obtaining immunity, he obviously had the opportunity to obtain information about his clients, the witnesses, or the operation of COL that would benefit Lowry's cause, but which would be encompassed by the attorney-client privilege. If he could not aggressively question these witnesses for fear of breaching the attorney-client privilege by touching upon some confidential

matter, his duty to his former clients would render him incapable of giving Lowry the level of representation he was entitled to. *See United States v. Spears*, 965 F.2d 262 (7th Cir.1992); *Roth*, 860 F.2d at 1385–86; *United States v. O'Malley*, 786 F.2d 786, 789–90 (7th Cir.1986). Finally, just prior to trial the government revealed that attorney Schick was being investigated by federal authorities. This raised another potential conflict of interest, as it was possible that as a result of the pressure of being investigated, Schick would either refrain from aggressive cross-examination during the trial in order that he might gain the favor of his potential prosecutors, or that he would be unduly hostile toward them, losing objectivity, and thus harm Lowry's rapport with the jury. *See Thompkins v. Cohen*, 965 F.2d 330 (7th Cir.1992); *United States v. Balzano*, 916 F.2d 1273, 1292–93 (7th Cir.1990).

Lowry only challenges his waiver of the last conflict, the one caused by the government's investigation of his attorney. Although it is clear from the record that he waived his right to conflict-free counsel in a hearing on the matter, *see* n. 5, *supra*, Lowry now contends that the waiver was not knowingly and intelligently made because he did not have sufficient information to make an informed, rational choice. Specifically, he complains: (1) that the prosecution only revealed that the investigation was related to drug dealing and money laundering and not connected to his case, and this was too general to enable him to make an intelligent and informed decision as to the likely impact of the conflict on his defense, (2) that he did not understand the risks created by the conflict or his alternatives to continuing with Schick, and (3) that the district court failed to sufficiently question him as to his reasons for the waiver, which would have revealed that he had no solid basis for his decision.

As to the first claim the issue is whether Lowry had sufficient information to make a rational choice, not whether every facet of every potential problem was detailed for him. *Williams*, 948 F.2d at

866–67. As the court stated in *Roth*, 860 F.2d at 1387–88:

> The right question ... is not whether the judge told the defendant everything. No choice of any kind is made with perfect information, and hindsight always turns up some additional snippet. The question is whether the defendant knew enough to make the choice an informed one—a rational reconciliation of risks and gains that are in the main understood. A choice may be intelligent and voluntary in this sense even though made without potentially-important information.

*See also Bridges v. United States*, 794 F.2d 1189, 1194 (7th Cir.1986) ("The waiver of constitutional rights, in general, may be effective even without specific knowledge of all the implications.") The court told Lowry everything it could: that Schick was being investigated, that the investigation was not related to his case, that Schick would probably not be indicted during trial, and that Schick would not be confined in jail during the course of the trial. *See* R. 121 at 7, 11. This was enough information for him to reasonably weigh the danger of the conflict against the benefit of retaining Schick's expertise. The risks were fairly obvious—Schick might either try too hard, damaging Lowry's case because he was personally angry at the prosecutors, or not try hard enough, attempting to curry the prosecutor's favor by sabotaging Lowry's defense—and these risks had been fully discussed in open court with Lowry present. We are of the opinion that he was in possession of more than ample information concerning the nature of the investigation to make a reasoned, intelligent choice, and he cannot avoid his waiver because more information might have been available. *United States v. Colonia*, 870 F.2d 1319, 1327 (7th Cir.1989) ("While more extensive discussions may be valuable and are encouraged, it suffices that a defendant know the character of the risks at stake and proceed with his eyes open.")

As to his understanding of the risks and the adequacy of the court's inquiry, it is helpful to refer to the record. On November 9, 1988, the court held a hearing to discuss the impact of the Schick investigation. With Lowry in attendance, both the court and the government fully discussed the ramifications of the ongoing investigation, explaining how it might hinder Schick's representation. R. 121 at 3–4. Next, after allowing a short recess for Schick to discuss the matter with his clients, the court questioned Schick, again noting the implications the conflict might have. Lowry, then, certainly understood the problems caused by the investigation. His argument before this court, however, is that the trial court should have advised him of his right to consult with outside counsel before waiving his right. While it might have been more prudent for the court to have done so, it was not necessary. This was the fourth hearing on conflict-of-interest issues; the court had held three prior hearings on the potential conflicts involving Schick's representation of government witnesses and of co-defendants. At each hearing the court discussed the conflict in detail with Schick and Lowry, and made sure that Schick had explained the situation to Lowry. Further, each time the court discussed the problems posed by the potential conflicts of interest it advised Lowry of his right to have different counsel. At each hearing Lowry voluntarily waived his right to conflict-free counsel on the record and insisted that he did not wish to be represented by anyone other than Schick. Thus, the judge could reasonably assume that the defendant was well-schooled as to his rights in that situation. Moreover, the potential conflict arising from the investigation was not difficult to appreciate,[6] and there was no reason to suspect that Schick, an experienced defense attorney, would be less than forthright with his clients. We are of the opinion that consultation with outside counsel would not have added much, if anything, to Lowry's appraisal of

---

**6.** This is especially so in light of Lowry's education and background. *See Johnson v. Zerbst, supra.* He was fifty-eight years old at the time of trial, had the equivalent of two years of college, had taught English at two business colleges, and had run his own mail-order and printing business since the mid–1960s.

the situation, and the court's failure to suggest that route does not render Lowry's waiver invalid. *Cf. Williams*, 948 F.2d at 868 (waiver of right to conflict-free counsel was still valid, even though trial court did not caution the defendant to obtain independent counsel, where the implications of the conflict were easily understood and retained counsel was in the best position to fully advise his clients).

 Lowry's final argument on this issue is that the waiver was invalid because the court failed to ask about the reasons he had for making his decision. It is true that the court did not ask Lowry to explain his thought process, but it is not required to do so. "Extended colloquys [sic] are not ... necessary conditions of valid waivers." *Roth*, 860 F.2d at 1389. The court's role is to ensure that the defendant has been informed of the nature of the conflict of interest and the risks inherent in the conflict, and the court may exercise its discretion in fulfilling that role. *United States v. Bradshaw*, 719 F.2d 907, 914–15 (7th Cir.1983). If the court is convinced that the defendant is making an informed, intelligent waiver, it is not required to conduct a time-consuming inquiry into each and every minute detail that a defendant might have thought of in support of his decision. As discussed above, Lowry was thoroughly informed of the conflict and attendant risk, and the court's method of dealing with the conflict was more than proper under the circumstances. All in all, Lowry's attempt to disassociate himself from his waiver is disingenuous: he had waived two conflicts of interest in prior hearings, he was well aware of his rights, and he was thoroughly questioned and given the opportunity to answer the district court inquiries. We therefore hold that his waiver was knowingly and intelligently made.

### B. *Ineffective Assistance of Counsel*

 Lowry next argues that his attorney's conflicts of interest deprived him of his right to the effective assistance of counsel. Unfortunately for Lowry, however, he forfeited any claim on this ground

when he waived the conflicts in order to keep Schick as his trial attorney. *See Roth*, 860 F.2d at 1389 ("A waiver given after such knowledge [of the risks created by a conflict of interest] is binding"); *Beniach*, 825 F.2d at 1211 ("Having made such a waiver, the defendant will not now be heard to complain of a conflict."); *see also Henderson v. Smith*, 903 F.2d 534, 537 (8th Cir.1990) ("Because we find that Henderson waived her right to conflict-free counsel, we need not reach the merits of [the ineffective assistance claim]"); *Duncan v. Alabama*, 881 F.2d 1013, 1017 n. 5 (11th Cir.1989) (once court found that waiver was valid, there was no need to determine whether the potential conflicts became "actual conflicts" at trial); *but see Cirrincione*, 780 F.2d at 628–29 (examining the record for evidence of an actual conflict of interest even though defendant had waived any conflict claims).

This is not to say that Lowry's waiver completely bars any ineffective assistance claim, but it does bar any claim based on Schick's alleged conflicts of interest. To hold otherwise would be to render the waiver meaningless; a defendant would lose nothing by waiving his right and sticking with counsel who had a conflict, since he could always allege "ineffective assistance" if convicted. Our holding, that a valid waiver of the right to conflict-free counsel bars any later claim of ineffective assistance growing from that conflict, is consistent with *Cuyler*, 446 U.S. 335, 100 S.Ct. 1708. *Cuyler* held that in cases where a defendant never objects to an attorney's representation of co-defendants, he can later triumph on an ineffective assistance claim by proving that "an actual conflict of interest adversely affected his lawyer's performance." *Id.* at 348, 100 S.Ct. at 1718. *Cuyler* thus provides somewhat of a safety net for defendants who fail to recognize a potential conflict in a timely fashion if that conflict should later materialize and hamper their defense. No such backstop is necessary here, where there has been full compliance with Federal Rule of Criminal Procedure 44(c)[7] and a

---

7. Rule 44(c) mandates that whenever criminal

defendants are jointly charged under Rule 8(b)

knowing, intelligent waiver of the right to conflict-free counsel. We have no doubt that Lowry clearly understood the dangers of counsel with a conflict, his rights, and his options, and that he made a knowing and intelligent waiver. That choice is binding.[8]

### C. *District Court's Failure to Disqualify Lowry's Counsel*

Next, Lowry maintains that the conflicts in this case were so egregious that the district court had an obligation to disqualify his attorney, despite his repeated waivers. While *Wheat* certainly gives district courts a discretionary power to veto a defendant's waiver of the right to conflict-free counsel in the name of justice and appearances, *see* 486 U.S. at 161–64, 108 S.Ct. at 1698–1700, that decision is left to the judge, *id.* at 163, 108 S.Ct. at 1699, and *Wheat* failed to delineate any instance where the court is required to override the defendant's waiver and disqualify the attorney. In other words, while courts sometimes *can* override a defendant's choice of counsel when deemed necessary, nothing *requires* them to do so. Indeed, for the law to require disqualification in certain circumstances would directly infringe upon the defendant's right to retained counsel of his or her choosing, giving the impression that the "system" has conspired against the accused in order to deprive him or her of the best representation. *Cf. Faretta v. California*, 422 U.S. 806, 834, 95 S.Ct. 2525, 2540–41, 45 L.Ed.2d 562 (1975) (to force a different lawyer on the petitioner might convince him that the law contrives

against him). As Judge Friendly cautioned in *United States v. Curcio*, 694 F.2d 14, 25 (2d Cir.1982), "the choice is mainly [the defendant's]; the judge ... is *not* to assume too paternalistic an attitude in protecting the defendant from himself."

Even though this case is unusual, in that the defendant's attorney had the potential for three distinct conflicts of interest, the record reveals that the court carefully explained each conflict in separate hearings, and that Lowry gave knowing and intelligent waivers each time. Given this consistency, it was certainly not an abuse of discretion for the court to let Lowry live with his decision. *Defazio*, 899 F.2d at 629 (a district court's decision regarding disqualification of counsel is reviewed for an abuse of discretion). Indeed, we are confident that if the court had disqualified Schick despite the multiple waivers, Lowry would now be claiming that he was deprived of the counsel of his choice by an overreaching, paternalistic judge.

### D. *Sufficiency of the Evidence*

Like many defendants, Lowry does not believe that the government presented sufficient evidence to establish his guilt beyond a reasonable doubt. He argues that the government failed to demonstrate that he had the specific intent to defraud COL members through his mailings, and that therefore his conviction should be reversed. *See United States v. Draiman*, 784 F.2d 248, 254 (7th Cir.1986) (mail fraud is a specific intent crime); *United States v. Martin–Trigona*, 684 F.2d 485, 492 (7th

---

or joined for trial under Rule 13 and are represented by the same or associated counsel, the court must advise the defendants of their right to effective assistance of counsel, including separate representation. Where appropriate, the court is empowered to take measures to protect each defendant's right to counsel by, for example, disqualifying the attorney. The purpose of the Rule is to ferret out conflicts of interest before the case goes to trial and prevent defendants from mounting post-conviction challenges based on ineffective assistance of counsel claims. Advisory Committee's Note, 1979 Amendment. Though Rule 44(c) only applies in cases of joint representation, the court here held Rule 44(c)-type hearings for each of the alleged conflicts, ensuring that Lowry thoroughly understood his rights and that each waiver was valid.

**8.** Even if there had not been a valid waiver, Lowry could only prevail now by demonstrating that an actual conflict of interest had adversely affected his lawyer's performance by pointing to specific instances in the record where another attorney could have and would have done something different. *United States v. Balzano*, 916 F.2d 1273, 1293 (7th Cir.1990); *Roth*, 860 F.2d at 1389. Lowry has not attempted to adduce any proof of an actual conflict affecting his lawyer's performance, and thus we would reach the same result even if our finding on the waiver issue were different.

Cir.1982) (lack of intent is a complete defense to mail fraud). Defendants challenging the sufficiency of the evidence face a difficult task. The test for sufficiency of the evidence challenges is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). Thus, to prevail on his claim, Lowry must establish that *no* rational trier of fact could have found he had the intent to commit mail fraud. At trial, Lowry contended that he lacked the intent to defraud because he sincerely believed that the COL's members understood that the Retreat, the Angels, and Chonda–Za were all part of a fantasy and viewed the letters and other materials in that spirit. He said that he never thought that members actually believed in the Angels, etc., and thus he never thought he was misleading them. Rather, he says, he urged members to send their "love offerings" so that they would feel more comfortable in ordering pictures and letters from the Angels; instead of feeling guilty about directly paying for such items, the members could fool themselves into thinking that the pictures and letters were tokens of gratitude for their generosity.

The evidence adduced at trial amply supports the jury's decision that Lowry intended to and did trick the members into believing that the Retreat and the Angels did actually exist in order that he might take advantage of their loneliness and vulnerability and get their money. COL members were instructed to mail their letters to Hillsdale, Illinois, the purported site of the Retreat. But since the Retreat was fictitious (though the members did not know it), the letters and gifts they sent simply accumulated in the Hillsdale Post Office each day until a Col employee picked them up

and brought them back several miles to Moline, Illinois, where other employees opened them and removed the checks. It is difficult to imagine why Lowry would want the mail delivered to another town, except to cover his tracks and perpetuate the fraud. Further, the Moline office had no exterior sign declaring that Col was located there, nor was Col listed in the phone book. Why the secrecy if everyone understood that the COL was a harmless fantasy? We also note that Lowry took great pains to give the letters a personalized feel by, among other things, using different writing styles and stationery for different Angels and attaching each Angel's "signature page" to her letters. These "signatures", actually rubber stamps, were also used to endorse checks mailed to specific Angels.

Lowry's claim that he never thought members actually believed in the Retreat and the Angels is further undermined by the nature of his solicitations. He asked for donations to pay for Angel Susan's medical bills after her fabricated auto accident, made more believable by the pictures Lowry sent of a battered and bruised Angel Susan in the hospital.[9] He also sought donations to pay the overdue taxes on the Retreat, donations to fix Angel Audrey's car, and donations to buy land and build Chonda–Za. Such requests would have been nonsensical if, as Lowry claims, the COL members all understood that the whole operation was a harmless fantasy. Yet he went out of his way to make the need for money seem as real as possible. As noted, he sent pictures of an injured woman in a hospital bed to raise money for Angel Susan. He also created an elaborate story about Angel Audrey being the only one who could get supplies for the Retreat so that the members would believe that her car had to be fixed or the Angels would perish. Such problems don't exist in a fantasy world, but somehow Lowry con-

---

**9.** These were actually pictures of the woman whose pictures were represented to be those of Angel Susan. This woman had been in a car accident, and Lowry used her hospitalization to capitalize on the members' sympathy for an injured Angel. Lowry also sent out nude pictures of the woman before the injury, an act he claimed was necessary to show the extent of her injuries. Neither party discusses whether the model actually received any of this money to pay her medical bills, but the scheme certainly worked on COL members, who sent numerous donations.

vinced members to send money to help solve them.[10] These requests indicate that Lowry knew full well that at least some members truly believed in the COL's existence, and that he could prey on their misguided generosity and compassion to his own profit. Finally, when he obtained the mailing lists used for his initial pitches, Lowry removed the names of all people living within a fifty-mile radius of Moline, indicating a fear that local members might be tempted to look for the Retreat, while those from farther away would be content to await the completion of Chonda–Za. And these are only the highlights. Our thorough review of the record has convinced us that a reasonable jury could easily have found beyond a reasonable doubt that Lowry had the specific intent to commit mail fraud, and his claim therefore fails.

### E. Sentencing

Lowry's final argument is that the trial court improperly refused to apply the United States Sentencing Commission's Sentencing Guidelines to his conspiracy conviction. This is an uncommon argument; defendants often try their best to avoid the Guidelines. Be that as it may, Lowry is correct. The Sentencing Guidelines went into effect on November 1, 1987. However, they apply not only to offenses committed after that date, but also to crimes referred to as "straddle offenses" that began before the effective date of the Guidelines and continued afterward. *United States v. McKenzie*, 922 F.2d 1323, 1328 (7th Cir.1991). As charged in the indictment, the mail fraud conspiracy continued at least until December 4, 1987, after the effective date of the Guidelines. Though they closed Col International before the Guidelines came in, Lowry, his wife, and Pamala St. Charles simply continued the same scheme under different names, using the same mailing lists and the Chonda–Za and Angels of Love concepts.

Though the government has confessed that the conspiracy here straddled the effective date of the Guidelines and that therefore the Guidelines apply to the conspiracy count, it maintains that this is the only part of the sentence to be considered on remand. We do not agree. As the Eleventh Circuit has observed,

> Sentencing on a multi-count conviction is an interrelated and intertwined process because of the statutory provisions for concurrent and consecutive sentences.... Multiple count convictions present the trial judge with the need for a sentencing scheme which takes into consideration the total offense characteristics of a defendant's behavior. When the scheme is disrupted because it has incorporated an illegal sentence, it is appropriate that the entire case be remanded for resentencing.

*United States v. Rosen*, 764 F.2d 763, 767 (11th Cir.1985). There were nineteen counts of conviction here, and the record shows that the court considered these counts as a whole when imposing sentence. After detailing the sentences on each count and which were to run consecutively and which concurrently, the court announced that the grand total was twenty-seven years. When defense counsel noted that the consecutive sentences given by the court totalled only twenty-five years, the court stated that it intended to give twenty-seven years, and so added a year to mail fraud counts 8 and 9, which were to run consecutively to the other sentences, to bring the total sentence to twenty-seven years. Thus, it appears that the district court had an overall sentencing plan in mind, which it carried out by tinkering with the sentences on each count. In order to allow the district court to reconsider its plan as a whole in sentencing Lowry, we remand for resentencing on all counts. *See United States v. Cea*, 914 F.2d 881, 888–89 (7th Cir.1990).

---

**10.** Victims of the scheme testified at trial as to the sum total of their donations to the COL. The low was $200, the high a whopping $33,000.

Ten of the thirteen witnesses had given $3,000 or more.

## IV. CONCLUSION

Lowry has failed to demonstrate that his waiver of the right to conflict-free counsel was either unknowing or unintelligent. As a result, his claims relating to the waiver, ineffective assistance of counsel, and the district court's failure to disqualify his attorney fall short. Likewise, his claim that the evidence of his intent was insufficient to convict also fails. He is correct on one point, however; the charged conspiracy began before the effective date of the Sentencing Guidelines and continued afterward, making it a "straddle offense" governed by the Guidelines. Since the Guidelines should have been used to calculate his sentence on the conspiracy count, we remand the case for resentencing on all counts.

AFFIRMED in part, REVERSED in part, and REMANDED.